Filed 12/15/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| ORANGE CITIZENS FOR PARKS AND RECREATION et al., | ) ) ) | |
| Petitioners, | ) ) | S212800 |
| v. | ) ) | Ct.App. 4/3 G047013 |
| THE SUPERIOR COURT OF ORANGE COUNTY, | ) ) ) | Orange County |
| Respondent; | ) ) | Super. Ct. No. 30-2011-00494437 |
| MILAN REI IV LLC et al., | ) ) | |
| Real Parties in Interest. | ) ) | |
| ———————————————— | ) | |
| ORANGE CITIZENS FOR PARKS AND RECREATION et al., | ) ) ) | |
| Plaintiffs and Appellants, | ) ) | Ct.App. 4/3 G047219 |
| v. | ) ) | |
| MILAN REI IV LLC et al., | ) ) | Orange County Super. Ct. No. 30-2011-00494437 |
| Defendants and Respondents. | ) ) ) | |

In 2006, real party in interest Milan REI IV LLC (Milan) purchased over 50 acres of land (Property) in the Orange Park Acres area in the City of Orange (City). Milan envisioned a 39-unit residential development (Project or Ridgeline Project) on the Property, which was formerly the home of the Ridgeline Golf Course and Country Club. But the Project was controversial because the private development would replace public open space. Despite the controversy, the City advanced the Ridgeline Project by approving Milan's request to amend its general plan and permit development on the Property. In response, the Orange Parks Association and a political action committee called Orange Citizens for Parks and Recreation (together, Orange Citizens) challenged the City's amendment by referendum. The City then changed course, arguing that there was no need to amend its general plan to approve the Ridgeline Project because a resolution from 1973 permitted residential development on the Property. The City thus concluded that the referendum, whatever its outcome, would have no effect. In November 2012, 56 percent of voters rejected the City's general plan amendment.

The main question before us is whether the 1973 resolution is part of the City's current general plan. The City frames its approval of Milan's development application and reliance on the 1973 resolution as an exercise of its legislative discretion to which we owe deference. But deference has limits. In light of the contents of the City's 2010 General Plan, no reasonable person could interpret that plan to include the 1973 resolution. Because we conclude that the City abused its discretion in interpreting the 2010 General Plan to permit residential development on the Property, we reverse the Court of Appeal's judgment upholding the City's approval of the Project.

# I.

Orange Park Acres covers over 1,500 acres of land in the foothills of the Santa Ana Mountains. In 1973, Orange's city council (City Council) established an Orange Park Acres development committee to resolve ongoing disputes among local landowners, developers, and residents. After 10 weeks of outreach and evaluation, the development committee adopted the Orange Park Acres Specific Plan (OPA Plan). The OPA Plan designates the Property for use as a golf course or, should that prove economically infeasible, for recreation and open space.

The City's planning commission considered the OPA Plan and, after a hearing, adopted resolution No. PC-85-73 on November 19, 1973. This resolution recommended that the City Council adopt the OPA Plan subject to amendments providing, among other things, that the Property be designated as "Other Open Space and Low Density (1 acre)" instead of "Open Space" and that the OPA Plan be adopted as "representing a portion of the land use element of the General Plan."

The City Council adopted the OPA Plan on December 26, 1973. The pertinent legislative act, resolution No. 3915, upholds the "recommendation of the Planning Commission" and identifies the OPA Plan as "the herein described General Plan for the Orange Park Acres area . . . as set forth in that certain plan prepared by J.L. Webb Planning Consultants [J.L. Webb], dated September 1973 and as amended by the Planning Commission on November 19, 1973." Neither the City Council's resolution No. 3915 nor the OPA Plan prepared by J.L. Webb referred to the planning commission's resolution No. PC-85-73 by name or described the planning commission's proposed amendments to the OPA Plan. In 1977, the City Council passed resolution No. 4448, which amended the general plan's land use element to permit low-density residential development in Orange Park Acres and removed the word "Specific" from the title of the OPA Plan. It also authorized the department of planning and development services to "make the

3

necessary changes to the official maps and text of the Orange Park Acres Area Plan and Land Use Element of the General Plan so that both documents correctly reflect" these changes.

For reasons that are unclear, the City never made these changes. Neither the text of the OPA Plan nor its attached land use policy map was revised to designate the Ridgeline Project site as "Other Open Space and Low Density (1 acre)" instead of "Open Space." If any members of the public had requested a copy of the OPA Plan, they would have received the unamended OPA Plan with resolution No. 3915 attached. Neither of these documents included the planning commission's proposed amendments in resolution No. PC-85-73. This oversight bred confusion from the late 1970s onward. City planning documents and internal analyses have referred to the OPA Plan in varying and inconsistent terms, sometimes describing it as part of the general plan, sometimes as a specific plan, and sometimes as a different type of plan altogether, such as an area, neighborhood, or community plan.

The City has revised its general plan since the OPA Plan's adoption. In 1989, the City adopted a general plan intended to "establish definitive land use and development policy to guide the City into the next century." On the 1989 land use policy map, identified by the general plan as the "single most important feature" of the land use element, the Property is designated as "OS/Golf" or "Open Space/Golf." The 1989 General Plan incorporated the OPA Plan under the heading "Area Plans." The publicly available OPA Plan also designated the Property as "Open Space."

In light of this history, both Milan and the City believed a general plan amendment would be required to develop the Property. When Milan submitted a development application in 2007, it requested a general plan amendment to change the Property's land use designation from "Open Space" to "Estate Residential," as

4

well as a change in zoning from "Open Space" to "R-1-40." In a September 2009 draft environmental impact report on the Project, the City agreed that Milan's proposed changes were required. The report indicated that the existing general plan designation for the Property is "Open Space," while finding that the Project was otherwise consistent with the 1989 General Plan and the OPA Plan.

In late 2009, as the City was processing Milan's development application, Milan's counsel discovered resolution No. PC-85-73 and conveyed it to the city attorney, prompting the City to conduct a comprehensive review of planning documents related to the Property. In a December 22, 2009, letter to the Orange Park Acres Homeowners Association, the city attorney reached the following conclusions: (1) the 1973 OPA Plan is part of the general plan, and (2) the OPA Plan designates the golf course portion of the property as "Other Open Space and Low Density (1 acre)." The city attorney observed that the OPA Plan and the Ridgeline Project were inconsistent with the City's general plan but asserted that "[f]rom a processing standpoint, [the city attorney's] findings have little impact on the Ridgeline project" because "the Plan's designation for the golf course is Other Open Space and Low Density (1 acre)."

At that time, the City was also revising its general plan, a final version of which was adopted in March 2010. The 2010 General Plan includes an introduction and 11 enumerated elements. It refers to (but does not incorporate) "[s]everal supporting documents [that] were produced during the development of the General Plan, including" an environmental impact report (EIR), a land use survey, a circulation model, inventories of historical and cultural resources, and market studies. It states, "The organization of the General Plan allows users to identify the section that interests them and quickly obtain a perspective of the City's policies on that subject . . . . Policies are presented as written statements,

tables, diagrams, and maps. All of these components must be considered together when making decisions."

The 2010 General Plan also discusses "ordinances, plans, and programs that should be consulted in association with the General Plan when making development and planning decisions." The 2010 General Plan directs readers to consult "Specific Plans and Neighborhood Plans in Orange" that "are intended to provide more finite specification of the types of uses to be permitted . . . ." The OPA Plan is listed as an "Adopted Specific Plan[] and Neighborhood Plan[]." While citing the OPA Plan as an example of "[e]arlier planning efforts that have influenced the growth and change within Orange," the 2010 General Plan states that specific and neighborhood plans, including the OPA Plan, "must be consistent with the policies expressed" in the land use element.

Part of the land use element is the land use policy map, which "indicates the location, density, and intensity of development for all land uses citywide." It designates the Project site as "Open Space" and defines "Open Space" as "[s]teep hillsides, creeks, or environmentally sensitive areas that should not be developed. Although designated as permanent open space, most areas will not be developed as public parks with the exception of river and Creekside areas that promote connectivity of the City's trails system."

In July 2010, the planning commission advised the City Council that a general plan amendment was "needed to (i) clarify and amend the original and unchanged terms of the existing OPA Plan which permitted both golf course and one-acre residential uses by amending the OPA Plan land use designation to Low Density – One Acre Minimum, . . . and (iv) make the General Plan land use designations for the subject property consistent throughout the General Plan." The planning commission recommended approval of such an amendment, general plan amendment No. 2007-0001, and found that "[u]pon approval of the proposed

6

amendments to the General Plan, the project is consistent with the goals and policies" of the 2010 General Plan.

On June 14, 2011, the City Council certified the final environmental impact report (FEIR) for the Project. The FEIR concluded that the OPA Plan was part of the general plan based on the city attorney's review of the City Council's actions in 1973. The report found that at the time the OPA Plan was adopted, "the very specific intent" of the City Council was that "one-acre residential lots be permitted on the Property." It explained that "most likely through clerical oversight and contrary to the express terms of resolution No. 3915, the textual changes recommended by the Planning Commission and approved by the City Council were never entered into any official copy of the OPA Plan. [¶] . . . In approving [general plan amendment] 2007-0001, it is the intent of the City Council to exercise its legislative discretion to honor the intent of the original adoption of the OPA, remove any uncertainty pertaining to the permitted uses of the Property, and allow uses on the Property which the City Council believes to be appropriate." The FEIR concluded that "contingent on passage of the proposed General Plan Amendment the proposed project would be both consistent and in many cases furthers the City's policies."

Also on June 14, 2011, the City Council adopted a general plan amendment, stating that "[u]pon approval of the proposed amendments to the General Plan, the project is consistent with the goals and policies of the City's General Plan that was approved by the City Council on March 9, 2010, including the OPA Plan which is part of the General Plan Land Use Element pursuant to City Council adoption of Resolution 3915 in 1973 that included the OPA Plan as 'part of the required land use element to be included in a General Plan for the City of Orange.' "

7

On June 17, 2011, Orange Citizens circulated a referendum petition challenging the City's general plan amendment. Orange Citizens filed the referendum with the city clerk on July 12, 2011, precluding the general plan amendment from taking effect. (See Elec. Code, § 9241.) But that same day, the City Council moved forward with the Ridgeline project, implementing Milan's requested zoning change and approving the development agreement with Milan. The City Council made several consistency findings, including a finding that the zoning change was "consistent with and further[ed] the objectives and policies of the Orange Park Acres Plan, which is part of the land use element of the General Plan, as amended by General Plan Amendment 2007-001," and that the development agreement was "consistent with the objectives, policies, general land uses, and programs specified in the . . . General Plan as amended by General Plan Amendment 2007-001, which General Plan includes the Orange Park Acres Plan as part of its land use element."

On August 18, 2011, counsel for Milan wrote to the city attorney with an "elegant solution." Counsel posited that City staff had inadvertently failed to update the OPA Plan to conform to the planning commission's recommendations in resolution No. PC-85-73 as adopted by the City Council in resolution No. 3915. This clerical error, Milan suggested, could not change the fact that the true designation for the Property was "Other Open Space and Low-Density Residential (1 acre)." Thus, the general plan amendment was not required to permit the Project to go forward. Instead, the "legal inadequac[y]" in the 2010 land use policy map could be remedied through "administrative correction."

The city attorney adopted this solution and, in an August 23, 2011 report, suggested that the general plan amendment's defeat by referendum would "not necessarily negate the other actions the City Council took" to advance the Ridgeline Project. While acknowledging that a general plan amendment would

8

make "the OPA Plan more internally consistent than it is without" and "more consistent with the approval of the Project," the city attorney reasoned that the project "would remain consistent [with the general plan] irrespective of repeal of the [general plan amendment]."

Meanwhile, on July 26, 2011, Milan filed a petition for writ of mandate and complaint for injunctive and declaratory relief to stop the referendum. Orange Citizens cross-complained, seeking to nullify the zone change and the Project's approval as inconsistent with the Property's land use designation under the 2010 General Plan. Milan filed its own cross-complaint, seeking to establish that the Project could proceed regardless of the outcome of the referendum because the Property's land use designation was controlled by the 1973 OPA Plan. Alternatively, Milan argued that the general plan amendment's defeat would be devoid of any legal effect because it would result in an internally inconsistent general plan.

In July 2012, the trial court entered judgment in favor of Milan. The court ordered the City to remove the referendum from the ballot and allow Milan to proceed with the Project "in accordance with the actual and original General Plan designation of the property as 'Other Open Space and Low Density (1 Acre).' " Orange Citizens filed a petition for writ relief, requesting that the Court of Appeal vacate the trial court's orders, reinstate the referendum to the November 6, 2012 ballot, and enter judgment in their favor. On July 12, 2012, the Court of Appeal issued an order to show cause and granted Orange Citizens' request for a stay of the trial court's order, allowing the public to vote on the referendum.

The referendum appeared on the November 2012 ballot. The city attorney's analysis in the ballot pamphlet stated that the amendment "clarifies that the Orange Park Acres Plan is part of the land use element of the City of Orange's General Plan and that the land use designation of 'Other Open Space and Low

9

Density (1 acre)' is the existing General Plan land use designation on the 51 acres of property." It explained that the general plan amendment was enacted in connection with the Ridgeline Project and concluded that the "land use map, which shows solely an 'Open Space' land use designation on the 51-acre site, would also be revised to reflect the 'Other Open Space and Low Density (1 acre)' General Plan land use designation." In November 2012, 56 percent of voters rejected the general plan amendment.

Despite the referendum, the Court of Appeal affirmed the Project's approval on July 10, 2013. Framing the central issue as "whether the Project is consistent with the City's pre-General Plan Amendment general plan," the Court of Appeal deferred to the City's consistency finding and found that substantial evidence supported the City's decision. The Court of Appeal further found that the land use designation in the 2010 land use policy map did not bar Milan's requested zoning change because "the Policy Map is not the end of the analysis." The Court of Appeal identified "contradictions and ambiguities that call into question the possibility of definitively determining the land use designation of the Property in the general plan," including "ambiguity in the land use classification of the Property" and "ambiguity in [the City's] planning documents." But the court found that this uncertainty counseled in favor of deferring to the City Council's judgment.

With respect to the practical effect of the referendum, the Court of Appeal held that despite the persistence of "erroneous information" in the 2010 General Plan, the vote "does not alter the reasonableness of the City Council's conclusion that the open space designation is an error and not a substantive inconsistency." The court reasoned that because the City has the power to "fix errors in the Orange Park Acres Plan and the Policy Map by reference to previously adopted

10

resolutions of the City Council," the amendment did not "matter with regard to the major points of contention."

We granted review.

## II.

The Legislature has recognized that "decisions involving the future growth of the state . . . are made and will continue to be made at the local level." (Gov. Code, § 65030.1; all undesignated references are to this code unless otherwise indicated.) To ensure that localities pursue "an effective planning process" (§ 65030.1), each city and county must "adopt a comprehensive, long-term general plan" for its own "physical development" as well as "any land outside its boundaries which in the planning agency's judgment bears relation to its planning." (§ 65300.) When adopting general plans, localities must "confront, evaluate and resolve competing environmental, social and economic interests." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 571 (*Goleta Valley*).) Because of its broad scope, long-range perspective, and primacy over subsidiary land use decisions, the "general plan has been aptly described as the 'constitution for all future developments' within the city or county." (*Id*. at p. 570.) Accordingly, "[t]he process of drawing up and adopting these revisions often becomes, essentially, a 'constitutional convention,' at which many different citizens and interest groups debate the community's future." (Fulton & Shigley, Guide to California Planning (4th ed. 2012) p. 118.) "During the preparation or amendment of the general plan, the planning agency shall provide opportunities for the involvement of citizens, California Native American Indian tribes, public agencies, public utility companies, and civic, education, and other community groups, through public hearings and any other means the planning agency deems appropriate." (§ 65351.) A legislative body must refer its proposal to a number of listed public entities before adopting or amending a general plan. (§ 65352.)

11

Planning commissions must hold at least one public hearing and make a written recommendation to the legislative body; legislators must hold at least one public hearing before acting on the recommendation. (§§ 65353–65356; see § 65354.5 [a planning agency authorized to approve or amend a general plan must "establish procedures for any interested party to file a written request for a hearing by the legislative body" and must provide public notice of any hearings].)

A general plan may be issued in "any format," including "a single document" or "a group of documents relating to subjects or geographic segments of the planning area" (§ 65301, subds. (a), (b)), so long as it "comprise[s] an integrated, internally consistent and compatible statement of policies for the adopting agency" (§ 65300.5). It also must include development policies, "diagrams and text setting forth objectives, principles, standards, and plan proposals," and seven predefined elements — land use, circulation, conservation, housing, noise, safety, and open space. (§§ 65302, subds. (a)–(g), 65303.)

Until 1971, the general plan was " 'just an "interesting study," ' " which did not bind local land use decisions. (*deBottari v. City Council* (1985) 171 Cal.App.3d 1204, 1211 (*deBottari*).) But now " '[t]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements.' " (*Goleta Valley*, *supra*, 52 Cal.3d at p. 570, quoting *Resources Defense Fund v. County of Santa Cruz* (1982) 133 Cal.App.3d 800, 806; see §§ 65359 [requiring that specific plans be consistent with the general plan], 66473.5 [same with respect to tentative maps and parcel maps], 65860 [same with respect to zoning ordinances], 65867.5, subd. (b) [same with respect to development agreements].) "A zoning ordinance that conflicts with a general plan is invalid at the time it is passed." (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 544 (*Lesher*).) In addition, the general plan must be internally consistent. "Internal consistency requires that

12

diagrams in the land use, circulation, open space, and natural resource elements reflect the written policies and programs of those elements." (Barclay & Gray, California Land Use & Planning Law (35th ed. 2016) p. 23.) In other words, "the requirement of consistency . . . infuse[s] the concept of planned growth with the force of law." (*deBottari*, *supra*, 171 Cal.App.3d at p. 1213.) " 'An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment.' " (Governor's Office of Planning & Research, General Plan Guidelines (2003) p. 164.)

The Government Code guarantees the public a role in adopting and amending a general plan. (§ 65300 et seq.) "The process . . . is structured to transcend the provincial. Public participation and hearings are required at every stage, in order to obtain an array of viewpoints." (*Goleta Valley*, *supra*, 52 Cal.3d at p. 571.) The Governor's Office of Planning and Research encourages local governments to structure their procedures to facilitate public involvement and suggests making planning materials available in different languages, conducting advertising and outreach to different segments of the community, holding events in familiar and welcoming spaces, and providing "access to information about the issues that are being addressed by the process." (Governor's Office of Planning & Research, General Plan Guidelines, *supra*, at p. 144; see *id.* at pp. 144–148.) At a more basic level, meaningful public participation in the planning process requires that the public have access to the general plan. Since 1984, the Government Code has mandated that "[c]opies of the documents adopting or amending the general plan, including the diagrams and text," be made available to the public "one working day following the date of adoption" or "two working days after receipt of a request for a copy." (§ 65357, subd. (b)(1), (2).)

13

**III.**

In support of the City's approval of the Project, Milan emphasizes that "[t]he OPA Plan was comprehensively reviewed and considered by the public when it was adopted in 1973. There is no evidence in the record to indicate that any of the subsequent General Plan amendments intended to change the designation of the Ridgeline Property in the OPA Plan." However, the relevant land use designation for the Property is not the general plan designation from 1973, but rather the designation in effect in 2012 after the voters rejected the City's general plan amendment. The import of that vote depends, in turn, on the Property's status before the City sought to amend the general plan in 2011. Milan contends that an amended OPA Plan has been continuously in effect since 1973, so the voters' rejection of the general plan amendment in 2011 merely preserved the status quo of the Property as zoned for open space and residential development. Orange Citizens argues that the Property's designation is solely open space, as determined by the text and maps in the publicly available version of the 2010 General Plan, so the voters' rejection of the 2011 amendment means that the Property remains open space. We conclude that Orange Citizens has the better view.

As an initial matter, Milan and the City correctly contend that our review in this case is confined to whether the City abused its discretion in finding the Project consistent with the 2010 General Plan. A city's determination that a development approval is consistent with its general plan has been described by some courts as "adjudicatory" (*San Franciscans Upholding the Downtown Plan v. City & County of San Francisco* (2002) 102 Cal.App.4th 656, 678) and by others as "quasi-legislative" (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782). Where a consistency determination involves the application of a general plan's established land use designation to a particular

14

development, it is fundamentally adjudicatory.  In such circumstances, a consistency determination is entitled to deference as an extension of a planning agency's " 'unique competence to interpret [its] policies when applying them in its adjudicatory capacity.' " (*San Franciscans Upholding the Downtown Plan*, at p. 678.)  Reviewing courts must defer to a procedurally proper consistency finding unless no reasonable person could have reached the same conclusion.  (*Id.* at p. 677; see *Joshua Tree Downtown Business Alliance v. County of San Bernardino* (2016) 1 Cal.App.5th 677, 695–696; *San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 514–515.)

Although the City and Milan contend that the City found the Project consistent with the 2010 General Plan, the record shows that the City Council's consistency finding was conditioned upon the general plan amendment in 2011 that was negated by referendum.  The City Council found that the relevant zoning change for the Property was "consistent with and further[ed] the objectives and policies of the Orange Park Acres Plan, which is part of the land use element of the General Plan, *as amended by General Plan Amendment 2007-001*."  (Italics added.)  It also found that the relevant development agreement was "consistent with the objectives, policies, general land uses, and programs specified in the . . . General Plan *as amended by General Plan Amendment 2007-001*, which General Plan includes the Orange Park Acres Plan as part of its land use element."  (Italics added.)  But even if we assume that the City found the Project consistent with the 2010 General Plan, we cannot uphold its approval of the Project under the terms of that plan.

The invalidity of the City's consistency finding is evident from the text of the 2010 General Plan and the City's and Milan's own understanding of it. Members of the public who requested the City's general plan at the time relevant here would have received its 2010 General Plan, a document with an introduction,

15

11 elements, and several appendices.  The introduction defines the General Plan as consisting of these documents and explains how the document should be interpreted.  The introduction begins by clarifying that even if the reader is only interested in a particular parcel, he or she may have to consult all of the 2010 General Plan's elements:  "The organization of the General Plan allows users to identify the section that interests them and quickly obtain a perspective of the City's policies on that subject.  However, General Plan users should realize that the policies in the various elements are interrelated and should be examined collectively . . . .  All of these components must be considered together when making planning decisions."  The introduction refers to several supporting documents but does not indicate that these documents have the authority of a general plan.  It expressly mentions the OPA Plan but makes clear that as a specific plan "[f]alling under the broader umbrella of the General Plan," the OPA Plan "must conform to General Plan policy" and "must be consistent with the policies expressed in this Element."

One of those policies in the land use element is an unambiguous designation of the Property as open space.  The 2010 General Plan includes a land use policy map within its land use element and notes that the map "indicates the location, density, and intensity of development for all land uses citywide."  The map designates the Property as open space and defines "Open Space" as "[s]teep hillsides, creeks, or environmentally sensitive areas that should not be developed."  No other element, appendix, or document incorporated into the 2010 General Plan states otherwise.  The publicly available OPA Plan, which "must be consistent" with the land use element under the terms of the 2010 General Plan, also designates the Property for use as a golf course and, in the alternative, as open space.

16

With such a specific land use designation for the Property, and without any competing designations, policies, or extant amendments to the contrary, no reasonable person could conclude that the Property could be developed without a general plan amendment changing its land use designation. Indeed, for several years, both Milan and the City agreed that the Property was designated for use as open space. Even after Milan identified resolution No. PC-85-73, the City continued to recognize that the 2010 General Plan designated the Property solely for open space, although it maintained that this defect would not be fatal to the Project.

Milan and the City argue that the OPA Plan is a part of the City's general plan and that the OPA Plan designates the Property's allowable land uses as "Other Open Space and Low Density (1 acre)." But the 2010 General Plan designates the OPA Plan as a specific plan, and the OPA Plan a citizen would have received in 2010 would have shown, in text and graphics, that the disputed property was not to be developed. The 1973 Resolution No. 3915 referred to the J.L. Webb draft OPA plan, which designates the property as a golf course or, if that should prove economically infeasible, for recreation and open space. Resolution No. 4448, from 1977, amended the general plan and directed that the OPA Plan be corrected to reflect that the property could be subject to low density development, but that correction never occurred. As a result, not only does no language permitting low density development appear in the publicly available OPA Plan, but the language that does appear designates the property for use as a golf course or open space. The 1973 planning commission amendment authorizing residential development never became integrated into the publicly available OPA Plan, let alone the 2010 General Plan. (See Gov. Code, § 65300.5; see also *id*. §§ 65302, 65303.) Any reasonable person examining the documents

17

publicly available in 2010 would have concluded that the OPA Plan was consistent with the General Plan map designating the Property as open space.

Even if Milan and the City were correct that the 1973 planning commission amendment did properly amend the OPA Plan to authorize low-density residential development on the Property, this would have made the OPA Plan inconsistent with the 2010 General Plan's land use designation for the Property. The City attempts to downplay the facial inconsistency between the 2010 General Plan, on one hand, and its interpretation of the OPA Plan and the Project, on the other. It stresses that no project is entirely consistent with a general plan " ' "[b]ecause policies in a general plan reflect a range of competing interests ." ' " (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 816.) For this reason, "[s]tate law does not require perfect conformity between a proposed project and the applicable general plan." (*Id.* at p. 817; see also *id.* at p. 816 [" ' "A reviewing court's role 'is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies." ' "].) Accepting this argument, the Court of Appeal found that the City's history with the OPA Plan created "contradictions and ambiguities" in the City's general plan and thus deferred to the City's consistency finding.

But here, while the Property is designated solely for open space in the General Plan, the Ridgeline Project calls for low-density residential development. No consistency between the 2010 General Plan and the Project can be found. The City does not point to any countervailing policy consideration from the General Plan that the Ridgeline Project furthers, nor does the City contend that it was trying to balance various competing interests in its consistency finding. (*Friends of Lagoon Valley*, at p. 816; see *Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1342 [planning agency abused

18

its discretion by finding consistency between a development and its land use element where the development's "inconsistency with [a] fundamental, mandatory and specific land use policy [was] clear"].) Contrary to the Court of Appeal's suggestion, the OPA Plan's history does not inject ambiguity into the City's 2010 General Plan.

The City did not need to structure its general plan as it did in 2010. A city may enact a general plan in any form it chooses. (§ 65301, subd. (a).) The City could have vested an amended version of the OPA Plan with general plan authority by adopting resolution No. PC-85-73 as a separate document that was incorporated into the 2010 General Plan. The City could have decided to conduct its general planning piece by piece, accumulating a general plan over time. But that was not what the City did, and on this point, the 2010 General Plan is unambiguous: The 2010 General Plan is an integrated document, authoritative except as amended. The City may have manifested a contrary intention in older documents such as resolution No. 3915 and resolution No. 4448. But the 2010 General Plan did not mention much less incorporate those resolutions. Instead, it designated the Property for exclusive use as open space in its policy map.

Relying on *Las Virgenes Homeowners Federation, Inc. v. County of Los Angeles* (1986) 177 Cal.App.3d 300 (*Las Virgenes*), the Court of Appeal opined that "the Policy Map is not the end of the analysis." In *Las Virgenes*, the county approved a development agreement for a project that was inconsistent with the land use designation apparently set forth in a high-level general plan land use map, but consistent with the applicable area plan's land use map. (*Las Virgenes*, at pp. 310–311.) Upholding the county's approval, the Court of Appeal noted that the general plan in that case provided that "a proposal may be consistent even if not literally supported by the map," that "mere examination of land use and other policy maps is insufficient to determine consistency," and that "policy maps are

19

general in character and are not to be interpreted literally or precisely." (*Id.* at p. 310.) Further, the general plan "was designed to include the more specific areawide [*sic*] plans as component parts" (*id.* at p. 311), especially since the countywide general plan land use map only displayed patterns that were 50 acres or larger (*id.* at p. 310). "The areawide plan serve[d] to complete, extend and refine the General Plan land use policy, not contradict it." (*Id.* at p. 312.)

*Las Virgenes* does not provide support for the City's approval of the Project here. *Las Virgenes* simply illustrates that uses of a particular parcel of land must be discernible from the general plan itself, however a city may choose to organize it. The general plan in that case directed interested parties to the other relevant documents, explained the relationship between the main body of the general plan and those documents, and indicated that the land use policy map did not identify the uses for every small parcel of land. In this case, the City chose to organize its general plan differently. By its own terms, the 2010 General Plan contains only an introduction, 11 elements, and several appendices. The introduction clarifies that a reader must consult all of the General Plan's elements to be certain of a particular parcel's use. The 2010 General Plan does not incorporate any extant documents designating the Property's land use as anything other than open space, and it notes that its policy map "indicates the location, density, and intensity of development for all land uses citywide." Thus, residential development on the Property is inconsistent with the 2010 General Plan under its express terms.

Milan argues that the City, after it adopted the 1973 resolution purporting to make the OPA Plan part of the general plan, never gave notice that it intended to change the general plan's designation of the Property. But why would the City and interested members of the public over the past 35 years consider amending the general plan's open space designation if the publicly available general plan already reflects such a designation? We must conclude that the 2010 General Plan

20

means what it says: The Property is designated as open space ("[s]teep hillsides, creeks, or environmentally sensitive areas that should not be developed"), a designation inconsistent with residential development like the Project.

Milan further argues that "[t]he City is not bound by a clerical error" because clerical errors cannot invalidate the provisions of a general plan; they are not legislative acts that comply with the Government Code's requirements for general plan amendments. To hold otherwise, Milan argues, would give municipal staff greater power than the City Council. But a city official cannot exercise a "power" that is by definition exercised inadvertently. Nor is there any allegation or evidence in the record indicating that a city official intentionally flouted the City Council's directive to write resolution No. PC-85-73's proposed changes into the OPA Plan in 1973. In any event, it is undisputed that the properly enacted provisions of the 2010 General Plan *could* amend a general plan. So while "[t]he City is not bound by a clerical error," it is bound by its failure to modify the OPA Plan to conform to resolution No. PC-85-73's proposed changes and to incorporate those changes into the 2010 General Plan.

## CONCLUSION

A general plan and its specific plans have been described as a "yardstick"; one should be able to "take an individual parcel and check it against the plan and then know which uses would be permissible." (Barclay & Gray, Curtin's California Land Use & Planning Law, *supra*, at p. 31.) "[P]ersons who seek to develop their land are entitled to know what the applicable law is at the time they apply for a building permit. City officials must be able to act pursuant to the law, and courts must be able to ascertain a law's validity and to enforce it." (*Lesher*, *supra*, 52 Cal.3d at p. 544.) That is why cities are directed to make their general plans available to the public. (§ 65357, subd. (b).) Public access has little value if the general plan's policies are not readily discernible. (See *City of Poway v. City*

21

*of San Diego* (1991) 229 Cal.App.3d 847, 862–863 ["Even though the general plan is always subject to change [citation], the material in the plan must have some current utility in order for the public to become informed of the current and projected land uses depicted in the plan."].)

The open space designation for the Property in the 2010 General Plan did not inform the public that the Property would be subject to residential development. The City's proposed general plan amendment put its citizenry on notice that such development would be possible. In response, Orange Citizens successfully conducted a referendum campaign against the amendment. If "legislative bodies cannot nullify [the referendum] power by voting to enact a law identical to a recently rejected referendum measure," then the City cannot now do the same by means of an unreasonable "administrative correction" to its general plan undertaken " 'with intent to evade the effect of the referendum petition.' " (*Assembly v. Deukmejian* (1982) 30 Cal.3d 638, 678.)

For the reasons above, we reverse the judgment of the Court of Appeal.

**LIU, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

23

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Orange Citizens for Parks and Recreation v. Superior Court
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 217 Cal.App.4th 1005
**Rehearing Granted**

_____

**Opinion No.** S212800
**Date Filed:** December 15, 2016
_____

**Court:** Superior
**County:** Orange
**Judge:** Robert J. Moss

_____

**Counsel:**

Daniel P. Selmi; Shute, Mihaly & Weinberger, Rachel B. Hooper, Robert S. Perlmutter and Susannah T. French for Petitioners and for Plaintiffs and Appellants.

Kerr & Wagstaffe, Michael von Lowenfeldt for Professor Joseph F.C. Dimento, Terrell Watt, AICP, Greenbelt Alliance and the Planning and Conservation League as Amici Curiae on behalf of Petitioners and Plaintiffs and Appellants.

Zach Cowan, City Attorney (Berkeley); David Kahn, City Attorney (Brisbane), Teresa Stricker, Deputy City Attorney; and Julia Hayward Biggs, City Attorney (Menifee) for City of Berkeley, City of Brisbane and City of Menifee as Amici Curiae on behalf of Petitioners and Plaintiffs and Appellants.

Michelle Wilde Anderson and David Pettit for California Native Plant Society, Center on Biological Diversity, Center on Race, Poverty & the Environment, Communities for a Better Environment, Endangered Habitats League, Friends of Harbors, Beaches, and Parks, Hills for Everyone, Natural Resources Defense Council and Sierra Club as Amici Curiae on behalf of Petitioners and Plaintiffs and Appellants.

Linda Krop for Environmental Defense Center as Amicus Curiae on behalf of Petitioners and Plaintiffs and Appellants.

Wayne W. Winthers, City Attorney; Woodruff, Spradlin & Smart and David A. DeBerry for Real Parties in Interest and for Defendants and Respondents Mary Murphy, City Clerk of the City of Orange, City Council of the City of Orange and City of Orange.

Duane Morris, Colin L. Pearce, Keith Zakarin, David E. Watson and Heather U. Guerena for Real Party in Interest and for Defendant and Respondent Milan REI IV LLC.

**Counsel:**

Nicholas S. Chrisos, County Counsel, and Leon J. Page, Deputy County Counsel, for Real Parties in Interest and for Defendants and Respondents Neal Kelley and Orange County Registrar of Voters.

Jennifer B. Henning; Michael R.W. Houston City Attorney (Anaheim); Mark W. Steres, City Attorney (Cerritos); Michael J. Shirey, Deputy City Attorney (Chula Vista); and Douglas C. Holland, City Attorney (Palm Springs) for California State Association of Counties and the Cities of Anaheim, Cerritos, Chula Vista and Palm Springs as Amici Curiae on behalf of Real Parties in Interest and Defendant and Respondents.

No appearance for Respondent Superior Court.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Robert S. Perlmutter
Shute, Mihaly & Weinberger
396 Hayes Street
San Francisco, CA  94102
(415) 552-7272

David A. DeBerry
Woodruff, Spradlin & Smart
555 Anton Boulevard, Suite 1200
Costa Mesa, CA  92626-7670
(714) 558-7000

Colin L. Pearce
Duane Morris
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105-1127
(415) 957-3000