Filed 10/25/2019

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| DENHAM, LLC, et al.,<br><br>      Plaintiffs and Respondents,<br>v.<br>CITY OF RICHMOND,<br>      Defendant;<br><br><br>SIERRA CLUB,<br>      Intervener and Appellant | A154759<br><br>(Contra Costa County<br>Super. Ct. No. MSN17-0669) |

After the City Council of the City of Richmond (the City) adopted an initiative amending its general plan to prohibit residential development on a stretch of hillside land, property owners affected by the initiative brought this action challenging the initiative. The trial court concluded the initiative rendered the City's general plan internally inconsistent and directed the City to vacate its adoption of the initiative. We agree with the trial court that the initiative caused the general plan to become impermissibly inconsistent, but disagree as to the appropriate remedy. We shall reverse the judgment and direct the trial court to issue a writ of mandate ordering the City to cure the inconsistency.

**GENERAL PLAN**

To set the stage, we begin with a brief discussion of the role of a general plan. Under state law, each city and county must " 'adopt a comprehensive, long-term general plan' for its own 'physical development.' " (*Orange Citizens for Parks & Recreation v.*

1

*Superior Court* (2016) 2 Cal.5th 141, 152 (*Orange Citizens*), citing Gov. Code, § 65300.)[1]  A general plan must include eight mandatory elements: land use, housing, conservation, open-space, circulation, noise, safety, and environmental justice. (§ 65302.)  "Because of its broad scope, long-range perspective, and primacy over subsidiary land-use decisions, the 'general plan has been aptly described as the "constitution for all future developments" within the city or county.' "  (*Orange Citizens*, *supra*, 2 Cal.5th at p. 152.)

Virtually any local decision affecting land use and development must be consistent with the general plan and its elements.  (*Citizens for Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 571.)  The general plan must be internally consistent; that is, the general plan and its elements must "comprise an integrated, internally consistent and compatible statement of policies for the adopting agency."  (§ 65300.5.) After all, "[a] document that, on its face, displays substantial contradictions and inconsistencies cannot serve as an effective plan because those subject to the plan cannot tell what it says should happen or not happen."  (*Concerned Citizens of Calaveras County v. Board of Supervisors* (1985) 166 Cal.App.3d 90, 97 (*Concerned Citizens*).)  Of particular importance to this case, "amendments to the general plan must be internally consistent and cannot cause the general plan to become internally inconsistent."  (*Visalia Retail, LP v. City of Visalia* (2018) 20 Cal.App.5th 1, 18.)

### FACTUAL AND PROCEDURAL BACKGROUND

The plaintiffs in this action own property in the Richmond hills that they will not be able to develop into residential neighborhoods as a result of the Richmond Hills Initiative.  Their property is designated "Hillside Residential" in the Richmond General Plan 2030 (the general plan).

The land use element of the general plan defines various land use classifications, and it maps out where in the City each should occur.  The Hillside Residential classification, one of several residential land use classifications, is defined to include

---

[1]All undesignated statutory references are to the Government Code.

"attached and detached single-family housing on subdivided parcels and clustered multi-family residential on developable portions of hillside parcels below the 400-foot elevation."[2]  The classification allows a density of up to five dwelling units per acre and building height of up to 35 feet.

The Richmond Hills Initiative (the initiative) was signed by more than ten percent of the City's registered voters and filed with the City on November 10, 2016.  In such a circumstance, section 9215 of the Elections Code gives a city the choice to adopt the initiative ordinance without alteration, submit it to the voters, or refer the matter to a city agency for a report.  (See Elec. Code, § 9212.)  At a public hearing on January 24, 2017, the City voted to adopt the initiative without alteration.

The initiative states that it "amends the Richmond General Plan by limiting development and land uses in the Richmond Hills . . . ."  The area subject to the initiative, or the "Richmond Hills Initiative Area," is described by identifying 38 parcels by assessor's parcel numbers.  Much of the initiative area includes property designated "Hillside Residential" in the general plan.

The initiative adds provisions to the general plan, specifically to the open-space element of the general plan.  Among the pertinent provisions, the initiative provides that the minimum parcel size in the initiative area is 20 acres; that the maximum floor area for all buildings in a parcel may not exceed 10,000 square feet; and that *if* residences and residential accessory buildings are permitted, they may not exceed 5,000 square feet of the 10,000 square foot maximum.

The initiative prohibits all residential development in the initiative area, unless a court finds this prohibition unconstitutional.  Specifically, under the heading "Permissible

---

[2] The entirety of the General Plan's description of the Hillside Residential classification is:  "Includes attached and detached single-family housing on subdivided parcels and clustered multi-family residential on developable portions of hillside parcels below the 400-foot elevation.  Hillside development should address key environmental challenges and constraints such as steep slopes and soil erosion.  Neighborhood mixed-use development is allowed at neighborhood nodes."  The specified density is up to five dwelling units per acre, with building height up to 35 feet.

Uses," the initiative allows in the initiative area "[t]he following uses only, and their normal and appropriate accessory uses and structures": agriculture; the processing, packaging, storage, or sale of agriculture produce; the rearing, boarding, or sale of horses and other animals; low-intensity outdoor recreation and exercise; "institutional and other non-profit uses that predominantly serve" the local area; "small facilities for convalescence, rehabilitation, and hospice care for not more than six patients each"; government and public utility uses; and "short-term events related to agriculture, animals, or outdoor recreation." Notably, "*[r]esidences, including mobile dwelling units, and residential accessory buildings are not permitted under this subsection*." (Italics added.) However, if a court finds that this prohibition on residential use constitutes a taking, one single-family home may be built on each parcel (or 20 acres of a parcel), together with normal accessory uses and structures.

The initiative also includes a number of specific amendments to the general plan, which it states are "made to avoid any inconsistency in the General Plan and with State housing law." These consist of minor amendments to two paragraphs of the land use element and more extensive amendments to the housing element. The changes to the land use element do not change the definition of "Hillside Residential" or the maps applying this classification to most of the initiative area. The changes to the housing element include removing many of the parcels in the initiative area from the inventory of vacant land available for housing development; reducing the tally of developable land in the City zoned for residential and mixed-use development from 228 acres to 148 acres; and specifying the Hilltop Mall area as suitable for high-density residential development.

Two property owners in the initiative area, Denham, LLC, and Nikta, LLC, brought a petition for writ of mandate and complaint for damages challenging the initiative on a variety of grounds, and another property owner, Gray1 Forest Green, LLC (Gray1), intervened as a petitioner. The petition named the City and its City Council as respondents and defendants, and the Sierra Club was allowed to intervene to defend the initiative. After proceedings not at issue in this appeal, the trial court concluded the

4

initiative was inconsistent with the general plan and could not be given effect.[3]  It entered judgment accordingly, and issued a writ of mandate directing the City, through its City Council, to set aside and vacate its adoption of the initiative.  Sierra Club has appealed.[4]

## DISCUSSION

### I. The General Plan Is Internally Inconsistent

Sierra Club contends the trial court erred in finding the initiative inconsistent with the general plan.  The amendment of a general plan is presumed valid, and we may not disturb it based on internal inconsistency unless, based on the evidence, a reasonable person could not conclude the plan is internally consistent.  (*South Orange County Wastewater Authority v. City of Dana Point* (2011) 196 Cal.App.4th 1604, 1619 (*South Orange*); accord, *Garat v. City of Riverside* (1991) 2 Cal.App.4th 259, 292–293 (*Garat*), disapproved on another point in *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743, fn. 11 [applying standard to initiative measure amending general plan].)  We reconcile portions of a general plan if reasonably possible.  (*No Oil, Inc. v. City of Los Angeles* (1987) 196 Cal.App.3d 223, 244 (*No Oil*).)

Petitioners have the burden to show the amendment rendered the general plan internally inconsistent.  (*South Orange*, *supra,* 196 Cal.App.4th at p. 1619.)  We conduct an independent review of a general plan's adequacy and do not defer to the trial court's conclusions.  (*Garat, supra,* 2 Cal.App.4th 259 at p. 292.)

The general plan amendment here was made through the initiative process.  As a result, it did not have the benefit of the procedures that are normally followed when a city amends its general plan, which may allow it to spot and remedy problems with a

---

[3] The court granted the petition for writ of mandate solely on petitioners' first cause of action, which alleged the initiative was inconsistent with the general plan.  The court entered judgment in favor of the City on several other causes of action, and petitioners dismissed their remaining causes of action.

[4] The City did not file a notice of appeal, although it submitted pleadings joining in Sierra Club's briefs on appeal.  Denham, LLC and Nikta, LLC filed a cross-appeal, which they have since dismissed, and we are informed that they may have been dismissed from the action entirely.  The respondent's brief was filed only on behalf of Gray1.

5

proposed amendment.  Those procedures involve public hearings and other means for citizens, public agencies, and other groups to participate (§ 65351); referrals to a number of public entities that are nearby or that might be affected by the action, including the county (§§ 65352, 65919, subd. (c), 65919.3, 65919.4, 65919.5); and submission of proposed amendments to the housing element of a general plan to the California Department of Housing and Community Development for review and written findings. (§ 65585, subd. (b).)  But a general plan may be amended by initiative, and an amendment by initiative bypasses these procedural steps.  (See *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 795–796 (*DeVita*).)

With regard to substance, however, courts do not use a "double standard for initiative amendments and general plan amendments enacted by the legislative body." (*DeVita*, *supra*, 9 Cal.4th at p. 796, fn. 12.)  An amendment adopted by initiative is " 'subject to the same constitutional limitations and rules of construction as are other statutes.' "  (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 540 (*Lesher*).)  Thus, a general plan amendment adopted by initiative may not be internally inconsistent, and like any other general plan amendment, it must not cause the general plan to become internally inconsistent.  (*DaVita*, at p. 796, fn. 12, citing § 65300.5.)

*A.  The Initiative Creates an Inconsistency*

This initiative on its face creates an inconsistency in the general plan:  The maps in the land use element place the property at issue in the Hillside Residential classification, which it still defines as including single-family housing on subdivided parcels and multifamily housing "on developable portions of hillside parcels below the 400-foot elevation," with density of up to five dwelling units per acre.  But the initiative by its terms amends a different element of the general plan—the open-space element—to prohibit residences in the initiative area, except to the extent a court finds a taking, in which case a single home is allowed on each parcel of at least 20 acres.  The initiative does not amend either the text or the maps in the general plan's land use element to show a different designation for the property, or to describe the Hillside Residential designation

6

in a manner consistent with the initiative. Thus, different elements of the general plan describe incompatible uses for the same property.

Sierra Club advances a number of arguments to contend there is no inconsistency. In perhaps the strongest of these, it argues the initiative's provision for a "Transferable Development Credit" program remedies the inconsistency. The existing general plan's open-space element contemplates development of a program for transferring "development privileges" from "natural areas" to other parts of the City. The initiative establishes a transferable development program, under which property owners in the initiative area are granted credits to build residences elsewhere in the City without complying with density limitations or other land use regulations that would otherwise bar their construction in the "receiving area," as long as the residences are similar to the type of residences that could otherwise be built there. The credits are limited to one per parcel in the initiative area or, where a parcel is more than five acres, one credit for each five acres.

We are not persuaded that this program makes the initiative consistent with the property's Hillside Residential designation. That designation indicates that property in the initiative area is suitable for residential use and for up to five dwelling units per acre. Under the initiative's transferable development program, a landowner receives, instead of permission to build such housing, credits to build a far smaller number of units in a *different* area of the City. While the availability of transferable development credits may mitigate the property owner's financial losses, it does not cure the inconsistency between the Hillside Residential designation and the initiative's ban on residential development. The fact remains that the land use element of the general plan authorizes considerable residential development in the initiative area, and the initiative forbids it.

As further support for its claim that the initiative is consistent with the Hillside Residential designation, Sierra Club contends the initiative does not prohibit *all* residential development because it allows hospice facilities for no more than six patients. It argues that hospice facilities are considered " 'Residential Facilit[ies]' " under the City's zoning ordinance, and hence, the initiative allows residential uses. But the

initiative amends the general plan to describe the permitted uses for the property—including hospice facilities—as "nonresidential uses," and the subsection setting forth the only permissible uses states that "[r]esidences" are not permitted.

For another example of residential development permissible under the initiative, Sierra Club points to the provision that if a court determines that the absence of residential uses effects an unconstitutional taking, one single-family home may be built on each parcel, or each 20 acres of a parcel. We do not interpret a provision authorizing a single home on 20 acres only *after* the property owner has gone to court and shown a constitutional violation as being consistent with a Hillside Residential designation, where "Hillside Residential" is specifically defined to allow considerably more housing.

As a fallback, Sierra Club argues that even a complete prohibition of residential use on the property would not render the general plan internally inconsistent because the Hillside Residential designation allows housing only on "*developable* portions of hillside parcels below the 400-foot elevation." (Italics added.) The general plan also recognizes that in Hillside Residential areas, development must address such "key environmental challenges and constraints" as "steep slopes and soil erosion." This language means, according to Sierra Club, that the general plan recognizes at least some land designated Hillside Residential as *not* developable, and the initiative simply specifies which property is not "developable." Sierra Club contends this resolution is consistent with the general plan's provisions that the land use element establishes a "broad vision and framework" for land use and locates "general land uses" in the City, while leaving to the City's zoning ordinance the task of "establish[ing] specific standards to regulate development." Again, we disagree. Except in the case of a judicially declared taking, the initiative flatly forbids residential uses of any property within the initiative area, regardless of whether it is otherwise "developable" or subject to environment constraints such as steep slopes or soil erosion. At the same time, the initiative permits a variety of nonresidential uses, some of which may include buildings—facilities for convalescence and hospice care, for boarding and care of horses, or for the processing, packaging, storage, or sale of agricultural produce. For *those* uses, the initiative includes restrictions limiting

8

development to what might be considered "developable lands," e.g., prohibiting development that would degrade wetlands, impair water quality or vegetation in a stream corridor, affect special-status species, or place buildings on steep slopes or above the 400-foot elevation. In sum, the initiative does not mark the entire initiative area as not "developable"; rather, it limits the development to specific *non-residential uses*.

Sierra Club contends the consistency requirement applies only to *policies* in the plan, not to "maps which simply depict policies applied to specific land areas." (*Garat*, *supra*, 2 Cal.App.4th at p. 300.) In *Garat*, the floodplain map in the safety element of a general plan showed a larger area subject to flooding than did the map in the open-space, conservation, and scenic highway element. (*Id*. at p. 299 & fn. 30.) The appellate court concluded the difference in the maps was not necessarily an inconsistency, because a public entity might well decide to consider a greater area as subject to flooding for purposes of planning for safety than for purposes of open space, conservation, and scenic highway planning. (*Id*. at 299–300.) *Garat* does not stand for the proposition that one element of a general plan may forbid a use that is expressly authorized for the same property in another element of the plan. The open-space element as amended by the initiative is inconsistent with the policy *and* the map regarding Hillside Residential property in the land use element of the general plan.

Sierra Club also points out that a general plan may contain competing policies (see, e.g., *Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 112–114 (*Cadiz*)), and urges us to apply the rule that we reconcile different parts of a general plan if reasonably possible (*No Oil*, *supra*, 196 Cal.App.3d at p. 244). The court in *Cadiz* concluded a landfill project was not necessarily inconsistent with a general plan that designated the primary use of the applicable land designation as limited rural development, open space, and agricultural activities, but that allowed compatible uses to coexist. (*Cadiz*, at pp. 113–114.) There was evidence in *Cadiz* that, with protective measures, a landfill was not an incompatible use. (*Id*. at p. 114.)

Relying on these principles, Sierra Club points to various policies in the City's general plan with which it contends the initiative is consistent. Those policies include

9

protecting open space and natural resources, revitalizing urban areas, including the Hilltop area, and identifying sites for additional housing. We have no quarrel with the proposition that the initiative is consistent with those policies. But that does not change the fact that it is facially inconsistent with the Residential Hillside designation. The only way to harmonize the initiative with the land use element of the general plan is to ignore either the property's designation as Hillside Residential or the land use element's description of that classification.

### B. *The Precedence Clauses Do Not Resolve the Inconsistency*

Sierra Club contends that two clauses in the initiative avoid any inconsistency with the general plan. Section 19(a) of the initiative provides that, with exceptions not relevant here, "application of any other provision of this General Plan is barred to the extent that it is in conflict with this Initiative." The effect of this clause is to elevate the initiative's amendments to the open-space element above conflicting provisions in the land use element. But the law is clear that "[n]o element of the general plan may take precedence over the provisions of other elements." (*Marblehead v. City of San Clemente* (1991) 226 Cal.App.3d 1504, 1510 (*Marblehead*).)

This principle was discussed in *Sierra Club v. Board of Supervisors* (1981) 126 Cal.App.3d 698 (*Sierra Club*). A county there had adopted the open-space and conservation elements of its general plan, and the following year adopted the land use element. Realizing that the maps that were part of each element were inconsistent in some areas, and lacking time to resolve the inconsistencies, the county included the following provision when it adopted the land use element: " 'If any conflict exists between the adopted open space and conservation elements and this land use element, this element should take precedence until the open space and conservation can be reevaluated and amended, if necessary.' " (*Id*. at p. 703.) Although the issue was later rendered moot, the appellate court considered whether this precedence clause was proper. (*Id.* at pp. 707–708.) The court noted that the general plan guidelines adopted by the Office of Planning and Research required all elements of a general plan to have equal legal status: " 'For instance, the land use element and open-space element cannot contain

10

different land use intensity standards rationalized by statements such as "if in any instance there is a conflict between the land use element and open-space element, the land use element controls." ' " (*Id*. at p. 708.)  The court therefore held that the precedence clause was void as prohibited by statute, including section 65300.5.  (*Ibid*.)

Sierra Club seeks to distinguish the clause in *Sierra Club* on the ground it was broader than the clause at issue here, expressly elevating one element of the general plan above another.  But the effect of section 19(a) is the same—that is, to cause the open-space element, as amended by the initiative, to take precedence over the land use element's designation of the property for Hillside Residential use or its description of that use.  Sierra Club finds a distinction in the fact that the county in *Sierra Club*, unlike the drafters of the initiative here, used the precedence clause to reconcile *known* inconsistencies in the general plan.  We see no reason why inconsistencies known or unknown should be treated differently.  Whatever the reason the drafters included the precedence clause here, under *Sierra Club* it is invalid.

In a further effort to save the initiative, Sierra Club argues that section 6(a) of the initiative prevents any inconsistency.  That section provides:  "Notwithstanding their literal terms, the provisions of this Ordinance do not apply to the extent that courts determine that if applied they would deprive a person of Constitutional rights or privileges, or otherwise would be contrary to Federal or State law.  These explicit limitations on applicability are to make certain that the provisions do not infringe any person's legal rights or privileges, violate the law in any respect, or subject the City to legal liability."  We fail to understand how this provision helps Sierra Club, since it would cancel inconsistent portions of the initiative, rather than conform the rest of the general plan to the initiative.  But in any event, section 6(a) suffers from the same infirmity as section 19(a), in that it, too, impermissibly subordinates one part of the general plan to another.  As a mechanism to resolve inconsistencies in the general plan, section 6(a) is therefore invalid under *Sierra Club*.

11

In sum, we agree with the trial court that the initiative creates an impermissible conflict within the City's general plan by amending the open-space element to prohibit residential development that the land use element continues to allow.

### C. Definitions Do Not Create Additional Inconsistencies

Finally, we briefly address Gray1's claim that the initiative creates additional internal conflicts by using definitions of the terms " 'floor area' " and " 'wetlands' " that are different from those in the preexisting general plan. The initiative expressly includes porches in the calculation of a building's floor area, while the existing general plan's definition of "Floor Area Ratio" simply refers to the "gross floor area of all buildings," without mentioning porches. As to the meaning of "wetlands," the initiative defines wetlands as "areas permanently or periodically covered or saturated by water where hydrophytic vegetation is present under normal conditions, have soils that are primarily hydric in nature, or are designated as wetlands by Federal or State law." The existing general plan defines wetlands as "[a] transitional area between terrestrial and aquatic systems where the water table is usually at or near the surface or where the land is covered by shallow water." Using different definitions in different parts of the general plan may be messy, but Gray1 has not shown that these definitions are inconsistent in any substantial manner. (*Concerned Citizens*, *supra*, 166 Cal.App.3d at p. 97.) Gray1 accordingly fails to establish that on these additional points the amended general plan is fatally inconsistent.

## II. Remedy

The question of remedy remains. The trial court ruled that because of the inconsistency, the initiative may not be given effect, and it ordered the City to vacate its adoption of the initiative.

Sierra Club contends the court should instead have directed the City to correct the inconsistency. It relies on section 65754, which provides in pertinent part: "In any action brought to challenge the validity of the general plan of any city . . . or any mandatory element thereof, if the court, in a final judgment in favor of the plaintiff or petitioner, finds that the general plan or any mandatory element of the general plan does

12

not substantially comply with the requirements of Article 5 (commencing with Section 65300): [¶] (a) The city . . . shall bring its general plan or relevant mandatory element or elements thereof into compliance with the requirements of Article 5 (commencing with Section 65300) within 120 days." We agree with Sierra Club that this provision controls. Once the trial court found that the general plan, as amended, violates section 65300.5's requirement of internal consistency, it should have ordered "[t]he city" to "bring its general plan . . . into compliance with" statutory requirements. (§ 65754.)

Gray1 contends section 65754 is inapplicable because the initiative violated state law and was therefore void *ab initio*. It relies on *Lesher*, *supra*, 52 Cal.3d at p. 544, which states, "A zoning ordinance that conflicts with a general plan is invalid at the time it is passed." But here, the initiative amends the *general plan*, not a zoning ordinance. As we have explained, a general plan is the constitution for all future land use, and subsidiary enactments, including zoning ordinances, must be consistent with the general plan.[5] (*City of Morgan Hill v. Bushey* (2018) 5 Cal.5th 1068, 1079 (*Bushey*); *Orange Citizens*, *supra*, 2 Cal.5th at p. 153; § 65860, subd. (a).) *Lesher* does not stand for the principle that an action that renders a general plan internally inconsistent is void ab initio.

In a somewhat different context, the court in *Garat* considered the reach of *Lesher* on this point. A challenge was brought to two land use ordinances adopted by initiative; the trial court concluded that a city's general plan was internally inconsistent as a matter of law, rendering consistency between the initiative measures and the general plan impossible, and it declared the measures invalid. (*Garat*, *supra*, 2 Cal.App.4th at pp. 271, 273–274.) The appellate court reversed. In so doing, it considered whether the proper remedy for a perceived invalidity in the city's general plan was to invalidate the measures. (*Id*. at pp. 302–304.) It answered that question in the negative, concluding instead that "the *primary* judicial remedy" should be the one the Legislature prescribed for inadequacy of a general plan, as set forth in section 65754. (*Id*. at p. 304.) The court

---

[5] As to zoning ordinances, this rule is subject to an exception for charter cities, which are not bound by state zoning law unless their charters or laws so provide. (§ 65803; *Garat*, *supra*, 2 Cal.App.4th at p. 281.)

13

rejected the argument that *Lesher* supported invalidating the initiative, explaining, "*Lesher* concerned a situation in which the validity of a zoning ordinance was challenged on the ground that the ordinance was void *ab initio* because it conflicted at the time of its adoption with a general law city's general plan; it did not concern a situation . . . in which the legal challenge is to the validity/adequacy of a general plan itself." (*Id*. at p. 304, fn. 34.) *Lesher's* principle of preemption simply does not apply where the inconsistencies are found within the same general plan.

The parties have drawn our attention to no case deciding whether a court may direct a city to correct inconsistencies in its general plan when the inconsistency is created by an initiative amending an existing plan. The court in *Lesher* expressly declined to consider this issue. (*Lesher*, *supra*, 52 Cal.3d at p. 540.) But in the circumstances before us, we believe such relief is available and appropriate. By its terms, the initiative amended the general plan by adding 16 sections and by making other amendments to the plan's existing language in an effort to avoid inconsistency with provisions of the general plan or state housing law. The intent of the initiative is clear, and, with minor quibbles that we have rejected, Gray1 does not claim any deficiency in the general plan other than the initiative's failure to amend the land use element to reflect the new limitations on development. We see no reason not to apply the legislatively prescribed remedy of section 65754.

Gray1 contends this remedy is unavailable under *Marblehead*, *supra*, 226 Cal.App.3d 1504. The voters there passed an initiative declaring that before a city's general plan could be amended, the city would have to find that stringent transportation and municipal service standards were met; it provided that the city's general plan would " 'be deemed to be amended to contain these concepts,' " and directed the city to revise the text of the general plan to reflect the provisions of the initiative. (*Id*. at p. 1507.) The appellate court concluded the measure did not directly amend the city's general plan, but rather, constituted "a resolution by the voters declaring that the city's general plan should be revised to reflect the '*concepts*' expressed in the measure . . . . Which elements of the general plan are affected and how the substantive terms of [the initiative] are to be

14

incorporated into these elements is unexplained." (*Id*. at p. 1510.) *Marblehead* held that a measure directing the city to amend the general plan is not within the electorate's initiative power. (*Ibid*.) *Marblehead* is inapposite. The initiative at issue here did not merely express concepts and direct the City to amend the general plan to incorporate them. Rather, it amended the general plan directly. In so doing, the initiative created an inconsistency in the general plan, and section 65754 prescribes the remedy for that problem. Nothing in *Marblehead* limits a court's power to direct a public entity to remedy a single inconsistency caused by an omission in an initiative.

Our high court considered an analogous issue in *Bushey*, *supra*, 5 Cal.5th 1068. In *Bushey*, a city had amended its general plan to change the land use designation of a vacant lot from " 'Industrial' " to " 'Commercial,' " anticipating a hotel would be developed on the property. The city later approved an ordinance changing the parcel's zoning designation to " 'CG-General Commercial,' " which would allow for a hotel, and a referendum was brought challenging the ordinance. (*Id*. at pp. 1076–1077.) The question the court faced was "whether the people of a county or city may challenge by referendum a zoning ordinance amendment that would bring the ordinance into compliance with a change to the county's or city's general plan, even though such a referendum would temporarily leave in place a zoning ordinance that does not comply with the general plan." (*Id*. at p. 1076.) The court concluded that such a referendum was permissible, "at least where the local government has other means available to make the zoning ordinance and general plan consistent." (*Ibid*.) Those other means could include rezoning the affected parcel to allow other forms of "commercial" development not including a hotel, which would be consistent with the general plan and a successful referendum. (*Id*. at p. 1090.) The court remanded the matter for the trial court to determine whether this was feasible. If not, "the trial court may also address whether a referendum can be invalidated where *the City has the ability to amend the general plan in order to conform the plan to the zoning designation that the referendum would leave in place*." (*Ibid*., italics added.) While our high court did not resolve this final issue, nothing in *Bushey* suggests it is improper to consider a city's ability to amend its general

plan when fashioning a remedy for an initiative or referendum that creates an inconsistency within a general plan.

Gray1 argues that the City cannot amend the ordinance without a vote of the people, and that the court therefore cannot direct the City to amend it to eliminate the inconsistency. The premise of Gray1's argument is correct. An ordinance that is proposed by initiative petition and adopted by the legislative body may not be "repealed or amended except by a vote of the people, unless provision is otherwise made in the original ordinance." (Elec. Code, § 9217.) Here, the initiative itself provides that it may be repealed or substantively amended only by a vote of the people. But although Gray1 is correct on this principle, that does not resolve the issue of whether the City can correct the inconsistency with other actions that are within its discretion. The City might, for example, amend the land use element of the general plan in a manner consistent with the initiative, or might submit to the voters a measure rescinding or amending the initiative so as to cure the inconsistency. As long as such options remain available, the City's inability to amend the ordinance without a vote of the people is no bar to applying section 65754.

In holding that general plans may be amended by initiative, our high court in *DeVita* addressed the concern that an initiative amendment would prevent a county from amending its general plan in the future to prevent obsolescence. The court dismissed that concern, explaining that the public entity would be able to amend its general plan in ways that did not conflict with the initiative amendment, or, if necessary to maintain an adequate general plan, the public entity could propose an amendment to the electorate. (*DaVita*, *supra*, 9 Cal.4th at p. 792.) Should a vote of the people be necessary, our high court admonished, "[w]e should not presume . . . that the electorate will fail to do the legally proper thing." (*DeVita*, *supra*, 9 Cal.4th at pp. 792–793.) Similarly here, we will not presume that the City or, if necessary, the voters will fail to take appropriate action to correct the inconsistency.

16

## DISPOSITION

The judgment is reversed.  On remand, the trial court shall issue a new writ of mandate directing the City to cure the inconsistency in its general plan in a manner consistent with the views expressed in this opinion.  Each party shall bear its own costs on appeal.

_____
TUCHER, J.

WE CONCUR:


_____
POLLAK, P. J.


_____
BROWN, J.

*Denham LLC v. City of Richmond* (A154759)

18

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court |
| Trial Judge: | Hon. Barry Goode |
| Counsel for Appellant: | Zach Cowan |
| Counsel for Respondent: | Cox, Castle & Nicholson LLP, Andrew B. Sabey, and Ashley Weinstein-Carnes |
| Counsel for Defendant: | Caolantuono, Highsmith & Whatley, PC, Holly O. Whatley |