Filed 6/4/26  Preserve Wild Santee v. City of Santee CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PRESERVE WILD SANTEE et al., | D085121 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2022-00041478-CU-MC-CTL) |
| CITY OF SANTEE et al., | |
| Defendant. | |
| HOMEFED FANITA RANCHO, LLC, | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Katherine A. Bacal, Judge.  Affirmed in part, reversed in part.

Allen Matkins Leck Gamble; Mallory & Natsis, Jeffree A. Chine and Heather S. Riley, for Appellant.

Center for Biological Diversity, John Buse and Peter J. Broderick, for Plaintiffs and Respondents.

No appearance for Defendant.

INTRODUCTION

The General Plan for the City of Santee (City) imposed a *maximum* residential capacity for development of land known as Fanita Ranch at approximately 1,395 units. This is how the City had for years interpreted the effect of lot size restrictions in the General Plan.

In 2017, HomeFed Fanita Rancho, LLC (HomeFed) proposed a multiuse development of Fanita Ranch with an increased density of up to 3,008-housing units. The proposed project was identified as *inconsistent* with the General Plan's lot size restrictions, by both the City and HomeFed in its application materials. In 2020, the City approved the proposed project by adopting an amendment to the General Plan to specifically allow the increased housing density.

The General Plan amendment did not take effect, however, because Santee citizens immediately challenged it by filing a petition for a referendum. Santee citizens also adopted a ballot initiative, Measure N, at the November 2020 election, which now requires voter approval for development that would increase residential density or intensity over what the General Plan allows in Santee.

In 2021, the City adopted an urgency ordinance to create a new program called the "Essential Housing Program." Under the program, a development project that is "certified" by City staff as an "Essential Housing Project" is "deemed 'compliant'" with the General Plan, with no public hearing and no appeal of the staff's decision to certify a project.

2

A few months later, HomeFed obtained certification of its Fanita Ranch project as an Essential Housing Project and, in 2022, reapplied for City approval of development at the site. The "new" project was virtually identical to the previous project, which along with its corresponding General Plan amendment had been set aside pursuant to court order following unrelated CEQA (California Environmental Quality Act) litigation. Importantly, the new project retained the same footprint with 3,008-housing units. The City approved HomeFed's project, this time asserting the project was consistent with the General Plan pursuant to the urgency ordinance it had adopted.

Preserve Wild Santee, Center for Biological Diversity, Endangered Habitats League, and California Chaparral Institute (together, Petitioners) sued. They filed a petition for writ of mandate against the City and HomeFed as real party in interest, contending the City's latest approval of HomeFed's project violated the State Planning and Zoning Law, the Subdivision Map Act, CEQA, and section 9241 of the Elections Code. The trial court agreed that the City had violated these four state laws in approving the project, and it entered judgment directing the City to set aside all approvals and certification of the project's Environmental Impact Report (EIR) associated with HomeFed's Fanita Ranch project.

HomeFed—but not the City—has appealed.

We conclude the City's actions violated the State Planning and Zoning Law, the Subdivision Map Act, and CEQA, but not section 9241 of the Elections Code. Our conclusion, however, does nothing to alter the correctness of that portion of the judgment in which the trial court ordered the issuance of a writ of mandate directing the setting aside of all project approvals and the certification of the project's EIR. We therefore partially

3

reverse the judgment as to the court's determination of the Elections Code claim and affirm the judgment in all other respects.

BACKGROUND

I.

*Impediments to Development Before HomeFed's Acquisition of Fanita Ranch*

The Fanita Ranch site covers about 2,638 acres of open space on the City's undeveloped northern edge. The site is surrounded to the west, north, and east by contiguous open space. Most of the site consists of coastal sage scrub and chaparral, and it also includes areas of native grassland, coast live oak woodland, riparian forest, and vernal pools.

Residential development of the Fanita Ranch site has been contemplated for decades. Both the County of San Diego and the City, after its incorporation, identified the site as suitable for development to accommodate regional housing needs.

In 1999, the City approved a 3,000 unit development for the site. But the Santee voters rejected that plan by referendum.

In August 2003, the Santee City Council adopted the Santee General Plan (General Plan). The General Plan sets out the land uses and intensities of development permitted on all land within the City. It designates the Fanita Ranch site as "Planned Development," and it places limits on the individual lot or parcel sizes within Fanita Ranch. The City has for years interpreted these lot size limits as constraining the maximum allowable density for the area. The General Plan does this through one of the sixteen "Guiding Principles" intended to inform the development of the Fanita Ranch site. The Guiding Principle for Fanita Ranch's lot sizes specifies: 20 percent of the residential lots are to be 6,000 square feet; 20 percent of the residential lots are to be 10,000 square feet; and 60 percent or greater of the residential

4

lots are to be 20,000 square feet. Under the City's own interpretation of these lot size requirements, the *maximum* residential capacity at the site under the General Plan is approximately 1,395 units.

In 2005, then-owner Barratt American, Inc. (Barratt) applied for approval of a Vesting Tentative Map and Development Review Permit. Barratt's proposal sought to develop the site with 1,380 single-family dwelling units, 15 live-work units, commercial uses, parks, and open space. The City certified a Final EIR (FEIR) for the Barratt project and approved it for development in 2007, and then certified a Revised FEIR (RFEIR) in 2009.

The City's approvals of the FEIR and the project were the subject of litigation in *Preserve Wild Santee et al. v. City of Santee et al.*, San Diego Superior Court case No. 37-2008-00075168-CUTT-CTL (*Fanita I*), and *Preserve Wild Santee et al. v. City of Santee et al.*, San Diego Superior Court case No. 37-2009-00097042-CU-TT-CTL (*Fanita II*). In *Fanita I*, the trial court determined the 2007 FEIR was deficient with respect to its plans for wildfire safety mitigation. This court affirmed the trial court's determination in part, holding that the FEIR improperly deferred certain mitigation measures and failed to adequately analyze water supply impacts and impacts to a specific butterfly species. (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 270–286 (*Preserve Wild Santee*).)

*Fanita II* was filed while the *Fanita I* appeal was pending. It challenged the City's return to the limited writ issued in *Fanita I*, as well as the adequacy of the 2009 RFEIR. The trial court determined the RFEIR continued to inadequately address required fire safety measures. (See *Preserve Wild Santee, supra*, 210 Cal.App.4th at pp. 267–268, fn. 5.) In 2013, the City vacated its approvals for the Barratt project. It also decertified both the 2007 FEIR and 2009 RFEIR.

In April 2013, the City adopted a General Plan Housing Element Amendment, which projected the Fanita Ranch site would permit the development of 1,380 single-family residential units plus 15 live/work units, for a total of 1,395 housing units.

## II.

### *HomeFed's Initial Project Proposal*

Sometime after litigation over the Barratt project ended, HomeFed acquired the Fanita Ranch site. In 2017, HomeFed proposed its own development project for the site, which was ultimately approved in 2020 (2017 Project). The 2017 Project included the building of either 2,949 housing units or 3,008 housing units, depending on whether a school was included in the plan. The 2017 Project was identified as *inconsistent* with the General Plan's requirements for development on the Fanita Ranch site, by both HomeFed's application materials and the City's planning and environmental review materials. Accordingly, the City and HomeFed agreed an amendment to the General Plan would be required to allow development of housing beyond 1,395 units.

To allow the anticipated increase in housing on the site, HomeFed proposed an amendment to the General Plan to ensure the 2017 Project was consistent with the General Plan. The proposed amendment would change the site's land use designation from "General Plan" to "Specific Plan," and alter or eliminate the 16 General Plan policies in place to govern development on the Fanita Ranch site.

A City Council resolution approving the 2017 Project stated that "a General Plan Amendment (GPA) is required" for the project to proceed. The City conceded a GPA was required because, among other things, the 2017 Project exceeded the maximum allowable housing units for the site under the

6

General Plan's policies.  The Draft EIR for the 2017 Project also acknowledged, "[T]he adopted Santee General Plan land uses for the project site [without amendment] . . . allow 1,395 residential units."  The City's Housing Element, which is a part of the General Plan, similarly and specifically stated the Fanita Ranch site has "capacity for 1,395 units, in accordance with [General Plan] Guiding Principles 1-3."

## III.

### *The City's Approval of the 2017 Project with the Proposed GPA*

On September 23, 2020, the City Council approved the 2017 Project.  It did so by adopting the proposed GPA and other necessary project approvals, and by certifying the EIR for the project.  The adopted GPA made two changes to the General Plan: (1) it changed the land use designation for the site in the Land Use Element from "Planned Development" to "Specific Plan," and (2) it amended the text of the General Plan, including the "Guiding Principles" for development of the Fanita Ranch site to permit increased housing intensity on the site.

## IV.

### *Santee Citizens Submit a Referendum Petition on the GPA*

Just over a month after the City adopted the GPA, on October 29, 2020, Santee citizens submitted a qualified referendum petition on the GPA to the City Clerk.  (See Elec. Code, § 9237.)  The qualifying petition prevented the GPA from taking effect.  The City then had two options for addressing the referendum petition: (1) it could repeal the subject ordinance outright; or (2) it could submit the ordinance to the voters for approval or rejection.  (*Id.*, § 9241 (section 9241).)

On January 13, 2021, the City Council chose to submit the referendum to the voters at the November 8, 2022 election. Consequently, as the City acknowledged in its Sixth Housing Element, "the developer cannot move forward with actual construction of the Fanita Ranch project until the referendum is resolved," because the GPA subject to the referendum "is necessary for the development [of the] Fanita Ranch project."

## V.

### *Santee Citizens Pass Measure N*

In the meantime, Santee voters adopted a ballot initiative—Measure N or the "Santee General Plan Protection Initiative"—at the November 8, 2020 election, which took place just over a week after citizens filed the GPA referendum petition with the City Clerk. As adopted by voters, Measure N now requires voter approval for development that would increase residential density or intensity over what the General Plan allows. Measure N expressly states that its purpose is to "protect the Santee General Plan from unwise densification and intensification amendments" and "protect the residents of Santee from overdevelopment with resultant traffic gridlock." After its adoption, Measure N's requirements were incorporated into the Land Use Element of the General Plan.

## VI.

### *The Court-Ordered Repeal of the GPA*

Multiple environmental groups filed a new CEQA lawsuit challenging the sufficiency of the City's environmental review for the 2017 Project (*Preserve Wild Santee, et al. v. City of Santee*, case No. 37-2020-00038168 (*Fanita III*)). In that action, the trial court determined the City had not adequately considered or disclosed the 2017 Project's wildfire safety and evacuation impacts. On April 26, 2022, the trial court issued a writ of

8

mandate directing the City to set aside all project approvals, including its adoption of the GPA.

Approximately one month later, in May 2022, the City set aside all approvals for the 2017 Project and repealed the ordinance adopting the GPA. Soon after, the City Council voted to remove the qualified referendum on the GPA from the November 2022 ballot.

VII.

*The City's Creation of a New "Essential Housing Program"*

Previously, on August 25, 2021, the City adopted Ordinance No. 592 (Ordinance 592 or the Ordinance), by which it created a new program called the "Essential Housing Program." Among other things, the Ordinance gives the Director of Development Services (Director) and planning staff the ability to certify a proposed housing development project as an "Essential Housing Project." In turn, the Director's certification allows the City to deem the proposed project " 'compliant' " with the General Plan. In this way, the Essential Housing Program provides a method for the City to avoid formally reviewing a proposed project for actual consistency with the General Plan. And it allows such projects to be approved *without* the adoption of a General Plan amendment to ensure consistency.

The Ordinance purports to place itself at the top of the hierarchy of all other City land use standards. It states: "In the event of a conflict between this Ordinance and any other City code, plan, or policy, the provisions of this Ordinance shall control with regard to Essential Housing Projects." However, the Ordinance also states that it shall not be "construed to relieve the City or Applicant from complying with state law, including without limitation the Subdivision Map Act . . . and the California Environmental Quality Act."

9

The mechanism by which a project is "certified" under the Essential Housing Program is through review by the Director and City staff "for compliance with the Objective criteria set forth in the Credits Assessment Guide." The Director may certify a project if it "achieve[s] at least 50 credits, as described [in the Credits Assessment Guide], and at least 10 of the credits must come from the Housing Category." Notably, some of the housing category credits can be obtained through a "contribution" of varying amounts of money to the "City's Affordable Housing Trust Fund to facilitate affordable housing in support of Program 7 of the Housing Element." There is no public hearing. And there is no appeal of a Director's decision regarding certification under the program.

The City passed the Ordinance as an urgency ordinance. This allowed it to take effect immediately.

VIII.

*The City Approves a Renewed Application for the Fanita Ranch Project after the Director Certified It as an Essential Housing Project*

A few months after the City adopted the Ordinance, in late November 2021, HomeFed submitted an "Essential Housing Program" application for the Fanita Ranch Project. On December 27, 2021, the Director "certified" the Fanita Ranch Project as an "Essential Housing Project." The certification document contains no project documents, a project description, maps, or other information that might permit members of the public to understand the scope and nature of the proposed project being "certified." The same day, the City issued a notice of CEQA exemption for the Director's certification. No hearing or action by the City Council was undertaken in connection with this notice.

Because the City's prior approvals for the 2017 Project had been set aside or repealed in May 2022, HomeFed sought new approval of the Fanita Ranch Project. According to a "Notice of Availability of the Draft Recirculated Sections of the Final Revised EIR" (Draft REIR) for the newly-proposed project that the City circulated for public review and comment, the "new" project (the 2022 Project) retained the same footprint and design as the 2017 Project, with one modification—the reincorporation of a road extension that had originally been part of the 2017 Project but had been eliminated through the approval process.

In seeking the City's approval for the 2022 Project, HomeFed did not propose a General Plan amendment, as it had done with respect to the virtually identical 2017 Project. The Draft REIR asserted that no amendment to the General Plan was required to ensure the 2022 Project's consistency because the Director had "certified" it as an "Essential Housing Project."[1]

On September 14, 2022, after a public hearing, the City Council voted to approve the 2022 Project, certify the related Final REIR, adopt a vesting tentative map, and adopt other project approvals and findings. The findings

_____

[1]   In various publicly available documents and statements, the City or its representatives had been asserting the opposite—i.e., that an amendment to the General Plan would be necessary for development of the site. For example, the City's Housing Element Update, which was published February 9, 2022, indicated "the developer cannot move forward with actual construction of the Fanita Ranch project until the referendum [regarding the GPA] is resolved." And in a June 13, 2022 article in East County Magazine, the article's author referred to the City's Mayor as having "noted that because the [Fanita Ranch] project would need an amendment to the city's General Plan, it would require a public vote," consistent with Measure N's mandate.

11

adopted by the City included a four-page analysis of the 2022 Project's consistency with the General Plan. There, the City asserted "the project is generally consistent with the 16 Guiding Principles," but then also stated, "the project is consistent with the Santee General Plan pursuant to Urgency Ordinance No. 592." Elsewhere, however, the findings conceded the Project "does not . . . meet minimum lot size requirements" set out in the General Plan.

## IX.

### *The Current Litigation*

This brings us to the current litigation. A month after the City approved the 2022 Project without amending the General Plan, Petitioners— a group of entities concerned about the environmental effects of the 2022 Project—filed a petition for writ of mandate in the trial court.[2] The operative first amended petition (Petition) originally alleged five causes of action, but at the time of the hearing on the merits, the following four causes of action remained:

(1) The first cause of action for a violation of California Environmental Quality Act ("CEQA"), based on the inadequacy of the environmental impact report, the findings, and the statement of overriding considerations;

(2) The second cause of action for a violation of the State Planning and Zoning Law, based on inconsistency with the General Plan;

(3) The third cause of action for a violation of the Subdivision Map Act, based on inconsistency with the General Plan; and

---

[2] Petitioners filed the petition for writ of mandate under Code of Civil Procedure sections 1085 (for cause of action 5) and 1094.5 (for causes of action 2 and 3), as well as under Public Resources Code section 21168, et seq. (for cause of action 1).

(4) The fifth cause of action for a violation of the Elections Code, based on approval of the 2022 Project despite the City's repeal of the General Plan Amendment after a referendum on the amendment qualified for the ballot.

Petitioners' requested relief was an order (1) directing the City to vacate and set aside certification of the REIR and all associated project approvals, (2) directing the City to comply with the State Planning and Zoning Law, the Subdivision Map Act, the Elections Code, and all applicable regulations; and (3) declaring the City's certification and approval of the 2022 Project violated all of the asserted state statutes, and further stating the certification and approval are invalid.

The trial court ruled in favor of Petitioners on each remaining cause of action. Specifically, the court concluded the City violated both the State Planning and Zoning Law and the Subdivision Map Act by approving a project that is inconsistent with the General Plan. And the City violated CEQA by failing to disclose and discuss inconsistencies with the General Plan.[3] Finally, the trial court determined the City violated the Elections Code by approving the 2022 Project, in essentially the same form as the 2017 Project, within a year of repealing the Ordinance in which it adopted the GPA required by the 2017 Project and which was the subject of a referendum.

---

[3] Although the trial court concluded the City violated CEQA by failing to disclose and discuss inconsistencies with the General Plan, it rejected Petitioners' other theories as to how the City violated CEQA, such as the allegations the City failed to recirculate notice, provided insufficient responses to comments from the public, and failed to disclose, analyze and/or mitigate biological impacts, wildfire and safety impacts, and transportation and traffic impacts.

13

The trial court issued a writ of mandate directing the City to rescind its approvals of the 2022 Project and entered judgment for Petitioners. HomeFed has appealed from the trial court's judgment. The City has not.

DISCUSSION

HomeFed challenges every aspect of the trial court's judgment.

First, it asserts the court erred in concluding the City violated the State Planning and Zoning Law and the Subdivision Map Act by approving a project that is inconsistent with the General Plan. In its view, the record demonstrates there is substantial evidence to support the City's conclusion that the 2022 Project is consistent with the General Plan.

Second, HomeFed asserts the trial court erred in concluding the City violated CEQA on the ground the City failed to disclose and discuss a major inconsistency between the 2022 Project and the General Plan. On this point, HomeFed argues, alternatively, that CEQA does not require an agency to "resolve" an inconsistency between a project and a general plan, and therefore any inconsistency is "not a CEQA issue"; but even under CEQA's requirement that an EIR disclose and discuss inconsistencies with a general plan, the Final REIR at issue here sufficiently "disclosed and analyzed potential inconsistencies with the General Plan and applicable development standards."

Third and last, HomeFed challenges the trial court's conclusion that the City violated Elections Code section 9241 by approving the 2022 Project within a year of repealing the ordinance in which it adopted the GPA proposed by HomeFed for the 2017 Project.

14

Except for the last, we reject each of HomeFed's contentions. We agree that no Elections Code violation has been shown, but conclude the trial court did not err in concluding the City violated the State Planning and Zoning Law, the Subdivision Map Act, and CEQA.

I.

*The 2022 Project Is Inconsistent with the General Plan and*
*Its Approval Violated State Law*

The trial court determined the 2022 Project is inconsistent with the General Plan, and this determination underpinned its ultimate conclusions that the City violated the State Planning and Zoning Law, the Subdivision Map Act, and, ultimately, CEQA. HomeFed thus seeks to reverse these conclusions primarily by demonstrating the City did not abuse its discretion when it deemed the 2022 Project consistent with the General Plan. HomeFed attempts to do this by offering two broad legal theories for its assertion of consistency.

First, HomeFed argues there is substantial evidence to support the City's finding that the 2022 Project is consistent with the General Plan under established legal standards for assessing a project's consistency with a General Plan. Second, it asserts that even if there is not sufficient evidence of consistency under generally applicable standards, there is a unique reason why the City's consistency determination is supported by the record here: the City's certification of the Project as an Essential Housing Project under the Ordinance's Essential Housing Program is sufficient to establish the 2022 Project's General Plan consistency. We discuss both theories in further detail, and explain why we are not persuaded by either.

15

A.     *The Role and Significance of the General Plan in Land Use Decision-Making and Development*

"Land use regulation in California historically has been a function of local government under the grant of police power contained in article XI, section 7 of the California Constitution." (*Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1151.) "To ensure that localities pursue 'an effective planning process' ([Gov. Code,[4]] § 65030.1), each city and county must 'adopt a comprehensive, long-term general plan' for its own 'physical development'[.] (§ 65300.)" (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 152 (*Orange Citizens*).) Thus, a general plan is required by the State Planning and Zoning Law (§§ 65000, et seq.; the SPZL).

Under the SPZL, a general plan must set forth "objectives, principles, standards, and plan proposals." (§ 65302.) A general plan may be issued in "any format," including "a single document" or "a group of documents relating to subjects or geographic segments of the planning area" (§ 65301, subds. (a), (b)), so long as it "comprise[s] an integrated, internally consistent and compatible statement of policies for the adopting agency" (§ 65300.5). It also must include development policies, "diagrams and text setting forth objectives, principles, standards, and plan proposals," and seven predefined elements—land use, circulation, conservation, housing, noise, safety, and open space. (§§ 65302, subds. (a)–(g), 65303.)

When adopting general plans, localities must "confront, evaluate and resolve competing environmental, social and economic interests." (*Orange Citizens, supra*, 2 Cal.5th at p. 152, quoting *Citizens of Goleta Valley v. Board*

_____

[4]     Further undesignated statutory references are to the Government Code.

16

*of Supervisors* (1990) 52 Cal.3d 553, 571 (*Goleta Valley*).)  A "general plan [thus] provides a ' "charter for future development" ' " and sets forth the legislative body's "fundamental policy decisions about such development." (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 815.)

In order to ensure the fundamental policy decisions set out in a general plan derive from thoughtful consideration of varying points of view and the *public's* interests, the process of adopting a general plan "is structured to transcend the provincial. Public participation and hearings are required at every stage, in order to obtain an array of viewpoints."  (*Goleta Valley, supra,* 52 Cal.3d at p. 571, citing §§ 65351, 65355.)  State law requires that " '[d]uring the preparation or amendment of the general plan, the planning agency shall provide opportunities for the involvement of citizens, California Native American Indian tribes, public agencies, public utility companies, and civic, education, and other community groups, through public hearings and any other means the planning agency deems appropriate.' (§ 65351.)" (*Orange Citizens, supra*, 2 Cal.5th at pp. 152–153.)  Further, "[a] legislative body must refer its proposal to a number of listed public entities before adopting or amending a general plan.  (§ 65352.)  Planning commissions must hold at least one public hearing and make a written recommendation to the legislative body; legislators must hold at least one public hearing before acting on the recommendation.  (§§ 65353–65356; see § 65354.5 [a planning agency authorized to approve or amend a general plan must 'establish procedures for any interested party to file a written request for a hearing by the legislative body' and must provide public notice of any hearings].)"  (*Id.* at p. 153.)

"Because of its broad scope, long-range perspective, and primacy over subsidiary land use decisions, the 'general plan has been aptly described as the "constitution for all future developments" within the city or county.' " (*Orange Citizens, supra*, 2 Cal.5th at p. 152.) Uniquely important for our purposes in this case, " ' "[t]he propriety of virtually any local decision affecting land use and development depends upon *consistency* with the applicable general plan and its elements." ' " (*Id.* at p. 153, italics added.)

The requirement of consistency with a general plan is imposed by statute through the SPZL: "County or city zoning ordinances shall be consistent with the general plan of the county or city." (§ 65860, subd. (a), italics added; see § 65867.5, subd. (b) ["A development agreement shall not be approved unless the legislative body finds that the provisions of the agreement are consistent with the general plan and any applicable specific plan."].) In addition, under the Subdivision Map Act, a city may only approve a map that is "consistent with the local general plan or an existing specific plan." (*Golden State Homebuilding Associates v. City of Modesto* (1994) 26 Cal.App.4th 601, 606; §§ 66473.5, 66474.)

A land-use enactment that conflicts with a general plan "is invalid at the time it is passed." (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 544 (*Lesher*).) "The court does not invalidate the ordinance. It does no more than determine the existence of the conflict. It is the preemptive effect of the controlling state statute, the [SPZL], which invalidates the ordinance." (*Lesher*, at p. 544.) In this way, " 'the requirement of consistency . . . infuse[s] the concept of planned growth with the force of law.' " (*Orange Citizens, supra*, 2 Cal.5th at p. 153.)

We review an agency's decision regarding consistency with a general plan "by ordinary mandamus, and the inquiry is whether the decision is

18

arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair." (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782.) "A city's determination that a development approval is consistent with its general plan has been described by some courts as 'adjudicatory' and by others as 'quasi-legislative.' Where a consistency determination involves the application of a general plan's established land use designation to a particular development, it is fundamentally adjudicatory. In such circumstances, a consistency determination is entitled to deference as an extension of a planning agency's ' "unique competence to interpret [its] policies when applying them in its adjudicatory capacity." ' " (*Orange Citizens*, *supra*, 2 Cal.5th at pp. 154–155 [cleaned up].) Therefore, a reviewing court is to "defer to a procedurally proper consistency finding unless no reasonable person could have reached the same conclusion" on the evidence before it. (*Id*. at p. 155.)

On appeal from a petition for writ of mandate, a reviewing court applies the same standard of review as the trial court and reviews the local agency's action de novo. (*Hamilton & High, LLC v. City of Palo Alto* (2023) 89 Cal.App.5th 528, 547.)

B. *The 2022 Project Is Facially Inconsistent with the General Plan under Established Standards for Assessing Consistency*

In HomeFed's view, under established legal standards for reviewing an agency's determination of a project's consistency with a general plan, the trial court erred by concluding the 2022 Project is inconsistent with the General Plan. HomeFed's argument is: A general plan does not need to be followed in every respect for consistency to exist because no project can be in perfect conformity with every policy in a general plan. The City is entitled to weigh the competing policies set out in the General Plan and reach an outcome that is "consistent" with the General Plan when the "overall" picture is considered.

19

And here, the City found that the 2022 Project is "in harmony with the General Plan's policies and objectives," and, according to HomeFed, this finding is supported by substantial evidence. As HomeFed explains, the City determined the 2022 Project was "in conformity with the vast majority of [the General Plan's] Guiding Principles and the policies and objectives of the Housing Element and the remaining General Plan Elements," even though it is "not in conformity with Guiding Principles . . . regarding (i) minimum lot sizes . . . in the development." HomeFed thus contends that the record demonstrates the 2022 Project is *sufficiently* consistent with the General Plan. We are not persuaded.

" ' "An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment." ' " (*Orange Citizens, supra*, 2 Cal.5th at p. 153.) Conversely, a project is inconsistent with the general plan if it (1) "frustrate[s] the general plan's goals and policies" (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 378) *or* (2) "if it conflicts with a general plan policy that is fundamental, mandatory, and clear" (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782 (*Endangered Habitats*)).

Even where a great number of aspects of a project will further the objectives and policies of the general plan, *a single facial inconsistency* with a specific land use element or designation in a general plan may nevertheless undermine a municipality's consistency finding. (See *Orange Citizens, supra*, 2 Cal.5th at pp. 156–158 [concluding project that included low-density residential development was facially inconsistent with general plan where a land use element in the general plan designated project site to be open space].) This is because "in determining whether a project conflicts with a

20

general plan, 'the nature of the policy and the nature of the inconsistency are critical factors to consider.'  A project is inconsistent with a general plan 'if it conflicts with a general plan policy that is fundamental, mandatory, and clear.'  In other words, a project's consistency with a general plan's broader policies cannot overcome a project's inconsistency with a general plan's more specific, mandatory and fundamental policies." (*Spring Valley Lake Assn. v. City of Victorville* (2016) 248 Cal.App.4th 91, 100–101 [cleaned up].)  *"A 'clear' inconsistency with even a single 'fundamental, mandatory and specific land use policy' may be 'enough to scuttle a project.'*  By contrast, a local agency has ' "some discretion" ' when it comes to a relatively 'amorphous' policy (such as a policy of ' "encourag[ing]" development "sensitive to natural land forms, and the natural and build environment." ' "  (*Joshua Tree Downtown Business Alliance v. County of San Bernadino* (2016) 1 Cal.App.5th 677, 697 [cleaned up], italics added.)

Here, the lot size restrictions in the General Plan use the word "shall," which renders the policy mandatory.  (See S*an Francisco Tomorrow v. City & County of San Francisco* (2014) 229 Cal.App.4th 498, 520 [use of "must" or "shall" in a general plan policy indicates it is mandatory].) The lot size restrictions also appear fundamental to the General Plan.  The Land Use Element in the General Plan sets out a range of allowable development densities for land in the City, and the density of development on a site is fundamental to land-use planning.  For example, in *Orange Citizens*, *supra*, 2 Cal.5th at pages 156–158, the facial inconsistency the Supreme Court identified involved a land use element designating open space, whereas the proposed project included a plan for light residential development on that land.  The Supreme Court implicitly determined the open space requirement of the General Plan—i.e., a housing density of zero—was fundamental to the

21

General Plan. Similarly, here, the nature of the restriction on lot sizes on the Fanita Ranch site, and the resultant density limitations that the City itself drew from those restrictions, are critical to other land-use decisions in the surrounding areas and touch on virtually every area of planning, such as traffic, safety, and conservation. We therefore conclude the lot size restrictions are fundamental to the Land Use Element of the General Plan. And, finally and importantly, the lot size restriction is specific, not amorphous. It provides an objective, quantitative mandate for lot sizes that leaves no room for subjective interpretation. Indeed, the City has been interpreting and applying the lot size restriction standard in the same way, consistently, for years.

Relying on *Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 411–416 (*Holden*), HomeFed argues the "Guiding Principles here provide [only] a 'blueprint' for flexible and innovative development, not mandatory standards." This argument is not well taken. In *Holden*, the court upheld a city's finding of consistency generally, despite the existence of an inconsistency with density standards. But in *Holden*, the density designations in that city's general plan were "not rigid" and included provisions expressing that the density could "be adjusted or modified," and the provided density was merely "recommended." (*Id.* at p. 417.) Unlike the density designations in *Holden*, the lot size standards in the General Plan are not mere recommendations, nor do they include language suggesting they are not rigid. For the reasons we just explained, including the plain text of the General Plan, the lot size restrictions are mandatory. HomeFed's attempt to analogize the City's consistency finding for the 2022 Project to a city's finding of consistency in *Holden* is therefore misplaced.

Moreover, the record does not support HomeFed's contention the City engaged in a "balancing" of the various policies in the General Plan or deciding that other policies should be given more weight. Nor does it support HomeFed's assertion that the City made a factual, record-based conclusion that the 2022 Project was "in harmony with the General Plan's policies and objectives." To the contrary, it is clear that the City determined the project was not required to be consistent with the policies of the General Plan, because it had exempted the project from an express finding of consistency by virtue of the Director's "certification" of the project as an Essential Housing Project under the Essential Housing Program.

Indeed, by its terms, Ordinance 592, which created the Essential Housing Program, purports to allow the City to avoid consideration of the policies and/or mandates set out in the General Plan altogether. It does this by "deeming" a project to be in compliance and consistent with the General Plan if it "achieve[s] at least 50 credits" based on a checklist of criteria. As a result, a project "certified" by the Director as an Essential Housing Project under the City's program would never require an amendment to the General Plan, whether or not it suffered from an actual-in-fact inconsistency with the policies and/or requirements of the General Plan. Thus, it is clear the City did not do any weighing of the policies set out in the General Plan to conclude the 2022 Project was consistent with it. Instead, the City simply "deemed" the 2022 Project consistent because it was certified as an Essential Housing Project under criteria that are different from the policies and mandates set out in the General Plan.

Beyond this, both the City and HomeFed have essentially conceded that the proposed development in the 2022 Project lacks consistency with the General Plan. Specifically, in connection with the virtually identical 2017

23

Project, the City and HomeFed both repeatedly acknowledged (1) the General Plan's lot size restrictions were effectively a density restriction and (2) the lot size restrictions are fundamental, specific, and mandatory. At all times prior to the submission of the 2022 Project application, both parties stated numerous times that a General Plan amendment was necessary for approval of the 2017 Project.

We see no principled reason to defer to the City's most current determination that the 2022 Project is "consistent" with the General Plan because it was "deemed" consistent under the Essential Housing Program, despite the project's deviation from the lot size requirements set out in the General Plan. For many years, the City interpreted its General Plan to require an amendment to the lot size restrictions for the building of any additional housing beyond 1,395 units in Fanita Ranch. There has been no material change to the General Plan or to the development as originally proposed in the 2017 Project that would account for the City's current determination that the 2022 Project is consistent with the General Plan. The only thing that has changed between the approval process for the 2017 Project and the 2022 Project is the City's voters passing an initiative requiring voter approval for any future General Plan amendments that seek to increase residential density or intensity over what is set out in the General Plan and the City adopting Ordinance 592.

C. *The City's Certification of the Project as an Essential Housing Project Under its Emergency Ordinance 592 Is Not Sufficient to Establish General Plan Consistency*

HomeFed next argues even if there is not sufficient evidence of consistency under generally applicable standards, the City's certification of the 2022 Project as an Essential Housing Project under the Ordinance's Essential Housing Program is sufficient to establish its General Plan

24

consistency. For this theory, HomeFed relies on various state housing laws and seeks to use the Essential Housing Program's purported "authorization" under those state housing laws to support its claim of consistency. We address these state housing laws and explain why HomeFed's second theory also fails.

1. *The Housing Accountability Act does not mandate approval of the 2022 Project.*

HomeFed contends the Housing Accountability Act (§ 65589.5; the HAA) applies to General Plan consistency determinations "in the housing context." In its view, "recent amendments to the HAA prohibit local agencies from disapproving or conditioning housing projects based on subjective standards." It asserts two provisions of the HAA require that the consistency of a project involving housing "be evaluated using only 'objective' standards— those that are 'uniformly verifiable' and 'involve no personal or subjective judgment by a public official.'" As it interprets these HAA provisions, HomeFed argues the General Plan's Guiding Principles "are not objective under this test," but instead are "broad, aspirational statements designed to guide discretionary decision-making and balance multiple competing goals," such that the HAA prohibits reliance on these Guiding Principles to disapprove of its project.

The two HAA provisions that HomeFed relies on are subdivisions (f)(4) and (f)(9) of section 65589.5. Subdivision (f)(4) of section 65589.5 provides:

> "(4) For purposes of this section, a housing development project or emergency shelter shall be deemed consistent, compliant, and in conformity with an applicable plan, program, policy, ordinance, standard, requirement, or other similar provision if there is substantial evidence that would allow a reasonable person to conclude that the housing development project or emergency shelter is consistent, compliant, or in conformity."

25

Subdivision (f)(9) provides:

> "(9) For purposes of this subdivision, 'objective, quantifiable, written development standards, conditions, and policies'[5] means criteria that involve no personal or subjective judgment by a public official and are uniformly verifiable by reference to an external and uniform benchmark or criterion available and knowable by both the development applicant or proponent and the public official before submittal, including, but not limited to, any standard, ordinance, or policy described in paragraph (4) of subdivision (o). Nothing herein shall affect the obligation of the housing development project to comply with the minimum building standards approved by the California Building Standards Commission as provided in Part 2.5 (commencing with Section 18901) of Division 13 of the Health and Safety Code. In the event that applicable objective, quantifiable, written development standards, conditions, and policies are mutually inconsistent, a development shall be deemed consistent with the criteria that permits the density and unit type closest to that of the proposed project."

Even assuming HomeFed is correct about the contours and requirements of section 65589.5, subdivisions (f)(4) and (f)(9) of the HAA, and even assuming *some* of the General Plan's Guiding Principles could be considered subjective, there is nothing discretionary or subjective about the Fanita Ranch lot size requirements set out in the General Plan. The lot size requirements involve no subjective judgment, and they are uniformly verifiable by reference to the

---

5     The phrase "objective quantifiable, written development standards, conditions, and policies" is used in multiple other subsections of section 65589.5, but the one that appears to apply to housing projects generally is subdivision (f)(1), which states in relevant part: "Except as provided in paragraphs (6) and (8) of this subdivision, and subdivision (o), nothing in this section shall be construed to prohibit a local agency from requiring the housing development project to comply with objective, quantifiable, written development standards, conditions, and policies appropriate to, and consistent with, meeting the jurisdiction's share of the regional housing need pursuant to Section 65584."

General Plan, rendering them objective on their face.  (§ 65589.5, subd. (h)(9) [objective standard is one "involving no personal or subjective judgment by a public official and being uniformly verifiable by reference to an external and uniform benchmark or criterion available and knowable by both the development applicant or proponent and the public official"].)  In fact, HomeFed's application for the 2017 Project conceded the maximum number of units permitted by the lot size restrictions in the General plan was 1,395, and multiple City documents repeatedly stated the lot requirements permitted a maximum of 1,395 residential units at the site.

Moreover, the HAA, by its terms, applies only to projects that are already consistent with applicable local planning standards, including, of course, a general plan, with two notable exceptions not present here.  (See *Snowball West Investments L.P. v. City of Los Angeles* (2023) 96 Cal.App.5th 1054, 1085 ["the HAA has made clear from its inception in 1982 that it only applies '[w]hen a proposed housing development project complies' . . . with the local 'general plan, zoning,['] and development policies" (quoting § 65589.5, subd. (j)(1))].)  The HAA is intended to place limitations on a city's ability to disapprove of an *already conforming* housing development project. (See § 65589.5, subd. (j).)  It does not allow for the excusal of a lack of consistency with a general plan, other than for an extremely limited subset of projects: (1) certain below-market housing projects, and (2) emergency shelters.  (§ 65589.5, subd. (d)(2)(A).)  The fact that the HAA allows inconsistency for a small subset of projects demonstrates the Legislature did not intend to override the consistency requirement for all other projects.

For these reasons, even assuming the HAA does what HomeFed claims it does with "subjective" planning standards, the HAA cannot save HomeFed from the mandatory objective standard for the Fanita Ranch lot sizes set out in the General Plan.

Later in its briefing, HomeFed again returns to the HAA for assistance in its appeal. There, it relies on the HAA to argue in summary fashion that the statute's provisions require the 2022 Project be "*deemed* consistent" (italics added) with the General Plan. In HomeFed's view, because the City "did not identify any inconsistencies with objective development standards," the project must necessarily be "deemed consistent." In support of this argument, HomeFed refers to section 65589.5, subdivision (j)(2)(B). Subdivision (j)(2) addresses a circumstance in which a local agency has determined a proposed project is not consistent with a general plan or other applicable land use and therefore has proposed to disapprove of the project based on the perceived inconsistency. Under subdivision (j)(2), if the project is a housing project and the agency determines it to be "inconsistent, not in compliance, or not in conformity" with local standards, the agency is required to "provide the applicant with written documentation" of the inconsistency within a specific timeline (depending on other aspects of the project). The failure of a local agency to provide the required written documentation within the specified timeline results in the project being "deemed consistent" with the local standards. (§ 65589.5, subd. (j)(2)(B).) This measure ensures local agencies provide housing project applicants with notice and an explanation of the intention to disapprove of a project early in the planning process so the developer can address the inconsistency.

We disagree with this argument too, and the case that HomeFed relies on—*Ruegg & Ellsworth v. City of Berkeley* (2021) 63 Cal.App.5th 277, 292, 318, 327–328 (*Ruegg*)—confirms our reading of subdivision (j)(2)(B). *Ruegg* involved the City of Berkeley *denying* a qualifying housing project's application and failing to provide the requisite notice to the project applicant of the project's purported inconsistency. But that is not what occurred here. In this situation, the City *approved* the project, after "deeming" it consistent with the General Plan by virtue of the Director "certifying" it as an Essential Housing Project. Subdivision (j)(2)(B) imposes no requirement of notification within a specific timeline when a project has been determined to be consistent with local land use standards and criteria. Because the City's position was that the 2022 Project is consistent with local land use standards, it had no reason to give the developer notice of an inconsistency under the HAA. Therefore, the lack of notice or explanation of an inconsistency within the timeline specified in the HAA—an inconsistency that was only identified by *the trial court* in this litigation, not by the City—cannot now be used as a way to require that the Project be "deemed" consistent under section 65589.5, subdivision (j)(2)(B) of the HAA.

2. *HomeFed is not entitled to rely on the City's "certification" of the 2022 Project under the "Essential Housing Program" to avoid the need for General Plan consistency.*

HomeFed asserts that "state housing law affirmatively authorized the City's Essential Housing Program [as created by Ordinance 592] and protected the [2022] Project's right to rely on that Program without requiring a General Plan Amendment." In its view, because certain other state statutes authorized the City to create the "Essential Housing Program," the City was entitled to rely on its "certification" of the 2022 Project under this Program as conclusively rendering it "consistent" with the General Plan.

29

HomeFed is incorrect. HomeFed has not demonstrated state statutes authorize the City's version of the "Essential Housing Program," and, even if that were the case, it would still be incorrect that such authorization of the Essential Housing Program would permit the City to avoid its duty to make a determination as to actual General Plan consistency and to obtain a General Plan amendment where an inconsistency exists.

Local land use planning and decision-making involves a clear hierarchy of applicable standards and rules. A general plan is "located at the top" of this hierarchy. (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 773.) This is why every local land use decision is assessed in terms of its consistency with the area's general plan. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 570.)

In this instance, however, the City relied on the Director's certification of the 2022 Project as an Essential Housing Project, which means only that the Project obtained enough "credits" under the Essential Housing Program. These "credits" are granted when the Director determines the project is consistent with any number of factors set out in the Essential Housing Program. These factors, however, do not reflect the standards and policies set out in the Santee General Plan for any particular area. One example is the Essential Housing Program permits a proposed development to obtain credits toward certification through a developer's contribution of money to the City's Affordable Housing Trust Fund. Thus a certification under the Essential Housing Program does not *guarantee* a project's consistency with the General Plan.

In some cases, it is possible that facial consistency with the General Plan will exist for a project certified under the Essential Housing Program. But as we have explained, the 2022 Project is facially inconsistent with the

30

General Plan with respect to the lot size requirements. Thus, by utilizing the certification process to "deem" the 2022 Project consistent with the General Plan without actually assessing it for consistency, the City has failed in its duties under state law. Certification under the Essential Housing Project does not require the consistency finding that it is necessary under state law to support a city's land-use approval. (§ 66473.5; *Woodland Hills Residents Assn., Inc. v. City Council* (1975) 44 Cal.App.3d 825, 837–838 [law requires "express finding" that proposed subdivision is consistent with applicable general plan].)

Moreover, the certification is completed by the Director, not the City's legislative body, which is the body required to make the finding of consistency. (See *Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 922 [stating City Council must make finding of consistency, but failure to do so was not prejudicial where no claim of inconsistency had been asserted].) Here, the Santee City Council delegated its exclusive authority to make findings of consistency by allowing the Director to certify the 2022 Project as an Essential Housing Project and then rely solely on that certification to conclude the 2022 Project should be "deemed" consistent with the General Plan. By employing this different process, the City Council avoided having to itself assess individualized information about the 2022 Project. It considered no maps, schematics, or even a project description, to assess whether the Project was consistent with the General Plan. An agency's finding of consistency must "bridge the analytic gap between the raw evidence and ultimate decision." (*Save Livermore Downtown v. City of Livermore* (2022) 87 Cal.App.5th 1116, 1130.) That did not happen here. In the absence of any raw evidence from which to

31

complete an analysis of consistency, the City has necessarily failed to bridge the analytical gap between evidence and an ultimate determination.

By using the Essential Housing Program certification process to "deem" the 2022 Project consistent, the City also failed to provide the notice and hearing required to amend a general plan to ensure conformance. Under state law, where there is a proposal that would "affect" the "intensity of uses of real property" through passage of a general plan or amendment of a general plan, specific notice and a hearing are required. (§ 65353, subd. (b).) Instead, the City used the Essential Housing Program certification process to avoid providing public notice and an opportunity for the public to be heard on the issue of the increased density of housing proposed to be developed through the 2022 Project.

Put simply, the certification process for the Essential Housing Program does not meet state statutory standards that are required for a City's amendment of a General Plan, nor does the 2022's Project's certification under the program by the Director support a finding of actual consistency with a General Plan. Where, as here, a project is facially inconsistent with a fundamental, mandatory and clear General Plan policy, the City's "certification" of the project—and the use of the "certification" to "deem" the project consistent—is insufficient to rectify that facial inconsistency or to render the City's approval of the 2022 Project lawful under the SPZL or Subdivision Map Act.

3. *The Density Bonus Law (DBL) does not permit the City to ignore the General Plan inconsistency*

HomeFed next argues the DBL permits increased general housing above what a general plan may allow for projects that provide for certain types of housing. It asserts the 2022 Project includes those specified types of housing. It alternatively argues that the DBL "authorized" the City to adopt

32

its "Essential Housing Program."  In its view, because a specific provision of the DBL—section 65915, subdivision (n)—authorizes local agencies to adopt "supplemental incentives and waivers" for housing, the DBL must have authorized the City to "lawfully exercise[ ] its discretion to grant waivers and incentives under the [Essential Housing] Program, [thereby] eliminating any purported inconsistency with the Guiding Principles and obviating any need for a GPA."  We disagree.

The DBL's purpose "is to encourage and provide incentives to developers to include low- and moderate-income housing units in their developments."  (*Wollmer v. City of Berkeley* (2009) 179 Cal.App.4th 933, 940.)  It allows certain *qualifying* projects to apply for and receive a limited density increase on a property above the maximum density otherwise allowed for the site.  But to qualify for the DBL program, a project must provide a specific percentage of state-law defined affordable housing units, or other specifically defined units.  (See § 65915, subd. (b).)  The density increase provided by the DBL is permitted on a sliding scale, proportional to the percentage of units the project sets aside as affordable (with differing levels of affordability).  (*Id.*, subd. (f).)

Importantly, the DBL limits its own application:  "*When an applicant seeks a density bonus for a housing development within, or for the donation of land for housing within, the jurisdiction of a city*, county, or city and county, *that local government shall comply with this section*.  A city, county, or city and county shall adopt an ordinance that specifies how compliance with this section will be implemented.  Except as otherwise provided in subdivision (s), failure to adopt an ordinance shall not relieve a city, county, or city and county from complying with this section."  (§ 65915, subd. (a).)

33

Here, there is nothing in the record, and HomeFed cites nothing, indicating it applied for, or received, a density bonus for the 2022 Project under the DBL's state density bonus standards. In fact, HomeFed's development application stated it *was not seeking any incentives, waivers, or concessions for the project under the DBL*. The application also stated the total number of "Affordable Units" was "0," and the total number of "Density Bonus Units" was also "0." There is no reference to the DBL in the various City documents related to the project. And there is no indication in the 2022 Project application that the Project would include any of the minimum percentages of state-defined affordable housing.

HomeFed seems to suggest that despite its asserted lack of reliance on the DBL in submitting its application, the Project nevertheless qualified for the DBL's state bonus housing density because it provided "445 senior units," and "150 low- and moderate-income units (on- and off-site), a $2.6 million in-lieu fee for very low income housing, and providing 1,650 acres of open space and other public benefits." None of these claims as to why the Project "qualifies" for additional housing under the DBL are relevant, given that HomeFed never sought a DBL density bonus, on these or on any other purported qualifying factors, and HomeFed expressly *disclaimed* that it was seeking any density bonus under the DBL.[6]

---

[6] HomeFed seeks judicial notice of two documents: (1) an "HCD [Dept. of Housing and Community Development] Letter of Technical Assistance to City of Los Angeles, July 31, 2024," and (2) a "California Assembly Select Committee on Permitting Reform Final Report—March 2025." It asserts the first document is relevant to this appeal because "it explains that state Density Bonus Law preempts rigid adherence to local policies when they conflict with the state's pro-housing objectives," and the second is relevant because "it explains procedural obstacles to housing production and recommends reforms to streamline permitting including addressing the use of CEQA to thwart housing." We deny HomeFed's request because, in our

Further, HomeFed's purported justifications for "bonus" housing under the DBL are themselves unpersuasive. First, it is not at all clear that the Project's units that HomeFed now refers to as "senior units" meet the definition of "senior citizen housing development," as defined in the statute, and HomeFed does not explain how these units would qualify the Project as a "senior citizen housing development." This omission is fatal to HomeFed's attempted reliance on "senior units" to claim the DBL allows an increase in density for the Fanita Ranch site without an amendment to the General Plan. Second, the DBL does not allow for a payment of a money "in-lieu" fee to provide for a density bonus, nor does it allow for increased density for planned open space. (§ 65915, subd. (b).) Beyond this, the DBL has very specific ratios of bonus density that it permits for certain amounts of developed affordable housing. There is nothing suggesting the 2022 Project would be entitled to an almost 100 percent density "bonus" under the DBL based on "150 low- and moderate-income units," only some of which are planned "on" the Fanita Ranch site.[7]

HomeFed also takes a slightly different tack in relying on the DBL by asserting subdivision (n) of section 65915 permits local agencies to extend DBL-like benefits to projects that do not meet the state's minimum DBL requirements. HomeFed is effectively suggesting that Ordinance 592 is a

---

assessment, these documents are not relevant to our determination of the issues on appeal. (See *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2023) 94 Cal.App.5th 764, 796, fn. 30 [appellate court may deny request for judicial notice of materials not relevant to court's determination of issues on appeal].)

[7] HomeFed notably refers only to "150 low- and moderate-income units (on- and off-site)," without specifying how many of those units are planned for the Fanita Ranch site.

35

local density bonus law, and, as such, the existence of Ordinance 592 allows the City to ignore General Plan policies in favor of approving additional housing. But subdivision (n) of section 65915 does not authorize a city to approve a project that is inconsistent with a General Plan in the absence of any indication the inconsistency results from a density bonus connected with the inclusion of low-income housing units. It states in full: "If permitted by local ordinance, nothing in this section shall be construed to prohibit a city, county, or city and county from granting a density bonus greater than what is described in this section for a development that meets the requirements of this section or *from granting a proportionately lower density bonus than what is required by this section* for developments that do not meet the requirements of this section." (§ 65915, subd. (n), italics added.) This paragraph refers to the very detailed density bonus tables provided in subdivision (f) of the DBL. And contrary to HomeFed's suggestion (that the DBL has authorized the City to provide an *unlimited* "density bonus" regardless of the General Plan's Housing Element requirements), this provision indicates the Legislature intended to permit a jurisdiction to grant a density increase that is *proportional* to the number of qualifying units provided on the site, even if the project does not meet the minimum number of qualifying units to be entitled to a density bonus under the state statute.

Moreover, nothing in subdivision (n) of section 65915 purports to authorize a municipality to allow a project to be "deemed" consistent with a general plan because it meets an entirely different set of standards, such as the credits needed for certification under Essential Housing Program. And nothing in the record indicates the City created the Essential Housing Program pursuant to this provision of the DBL, or that the DBL forms the basis for the City's certification of the 2022 Project as an Essential Housing

36

Project. Notably, Ordinance 592 does not invoke or refer to the DBL, and the DBL is not mentioned in staff reports or supporting documents surrounding the 2022 Project. Nor did the City make any findings related to the DBL, or any low income or other DBL-qualifying housing in connection with the Project.

Beyond all this, HomeFed fails to explain how even the general authorization of a program such as the Essential Housing Program by the DBL would also authorize the City to override the state law requirement of general plan consistency. HomeFed does not analyze whether such assumed authorization creates a conflict with either the SPZL or Subdivision Map Act, or, if so, how such a conflict should be resolved. In the absence of any attempt to demonstrate how the state statutes operate together or to provide a cogent framework for how to analyze their relationship if or when a conflict arises, HomeFed has failed to demonstrate the DBL allows the City to do what it did here.

4. *The City's general police power and Section 36947 do not give the City authority to rely on the Essential Housing Program to avoid General Plan consistency.*

HomeFed next claims the City "adopted the [Essential Housing] Program under its municipal police power and Government Code section 369[3]7." Here, HomeFed argues the Essential Housing Program was a response to "the City's acute housing crisis and the prolonged delays and barriers to housing development created by procedural and litigation obstacles." Missing from this argument, however, is any explanation as to how the general power the City possesses to adopt ordinances (i.e., through section 36937) authorizes it to use that power to legislate in a way that violates state statutory requirements, such as the SPZL and the Subdivision Map Act. The omission is fatal.

37

The allegation by Petitioners is that by utilizing the Essential Housing Program as the basis for excusing General Plan inconsistency, the City has violated both the SPZL and the Subdivision Map Act (among other things). There is no question the City has the authority to adopt ordinances, and even urgency ordinances such as Ordinance 592. But the question in this litigation is not whether the City had the authority to adopt the Essential Housing Program. It is whether the City can rely on the Essential Housing Program to excuse the 2022 Project's facial inconsistency with the General Plan and approve the Project despite that inconsistency.

5. *HomeFed has not demonstrated it has a "vested right" to rely on the Essential Housing Program*

In a conclusory argument, HomeFed asserts it has a vested right to the approval of the 2022 Project based on the existing law at the time it submitted its application for the project. HomeFed cites section 65589.5, subdivision (o), asserting because the Essential Housing Program was "in effect at the time of [the 2022 Project] application," the "City was . . . prohibited from eliminating or modifying its terms as relates to the Project." This argument fails to persuade us, too.

Section 65589.5, subdivision (o), ensures an agency does not adopt new land use regulations and apply those to a project after the submission of a project application. For example, subdivision (o)(1) states in relevant part, "a housing development project shall be subject only to the ordinances, policies, and standards adopted and in effect when a preliminary application including all of the information required by subdivision (a) of [s]ection 65941.1 was submitted." Subdivision (o)(2) provides some exceptions, allowing for four circumstances in which later adopted ordinances, policies and standards may nevertheless be applied to a project for which an application has already been submitted.

38

What HomeFed's argument ignores is that at the time it submitted its application, the General Plan standards, including its lot size requirements, were *also* in place. Thus, the General Plan standards were "in effect" and necessarily also apply to the 2022 Project application. Subdivision (o) of section 65589.5 does not operate to give the Essential Housing Program priority over the General Plan standards and policies, both of which were in effect at the time HomeFed applied to develop the 2022 Project. This provision therefore offers HomeFed no assistance.

In sum, we reject both theories offered by HomeFed for how the City's determination of General Plan consistency is supported by the record. Like the trial court, we conclude no reasonable person could have determined the 2022 Project is consistent with the General Plan. (See *Orange Citizens, supra*, 2 Cal.5th at p. 155.)

D.    *The City Violated CEQA By Certifying an EIR That Fails to Disclose or Discuss the Inconsistency*

In a separate set of arguments, HomeFed contends the trial court "improperly treated a planning law dispute as a CEQA violation" and thus erred in concluding the City violated CEQA. In a CEQA case, we review " 'the agency's action, not the trial court's decision.' " (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495 (*Protecting Our Water*).) "The ultimate inquiry . . . is whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' The inquiry presents a mixed question of law and fact. As such, it is generally subject to independent review. However, underlying factual determinations—including, for example, an agency's decision as to which methodologies to employ for analyzing an environmental effect—may warrant deference. Thus, to the extent a mixed question requires a

determination whether statutory criteria were satisfied, de novo review is appropriate; but to the extent factual questions predominate, a more deferential standard is warranted." (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 516 (*Sierra Club*) [cleaned up].)

HomeFed asserts the question whether a project is consistent with a general plan is "not a CEQA issue" because CEQA "does not require an EIR to resolve or eliminate potential inconsistencies with a general plan, nor does CEQA require that a project be consistent with a general plan as a condition of EIR certification." From these contentions, HomeFed asserts the court erred in determining that the facial inconsistency between the City-approved Fanita Ranch development and its General Plan—a mere "planning law dispute," according to HomeFed—necessarily equated to a CEQA violation by the City.

Although we consider these issues anew, applying the same standards as the trial court (see, e.g., *Protecting Our Water, supra*, 10 Cal.5th 479, 495), it is worth clarifying the inaccuracy of HomeFed's assertions about the approach taken by the trial court. We see nothing to suggest the court determined the City violated CEQA because the certified Final REIR did not "resolve" the inconsistency between the 2022 Project and the General Plan. Nor does the record show that the court considered the Final REIR inadequate merely because the Project is inconsistent with the General Plan. Instead, the court determined the Final REIR failed to adequately *disclose* the inconsistency between the 2022 Project and the General Plan. And as a consequence of this failure, the Final REIR also failed to address, discuss or consider the effect of this inconsistency. We agree with the trial court's analysis and reach the same conclusion on this record.

40

CEQA requires an EIR to disclose to the public and discuss any inconsistency between the reviewed project and the general plan. (CEQA Guidelines, § 15125(d) ["The EIR shall discuss any inconsistencies between the proposed project and applicable general plans, specific plans and regional plans."]; see *Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1566 [" ' "while there is no requirement that an EIR itself be consistent with the relevant general plan, it must identify and discuss any *inconsistencies* between a proposed project and the governing general plan" ' "].) Because an adopted plan may affect existing physical environmental conditions, the EIR typically must address the applicable general, specific, or regional plan as part of the baseline against which the project's likely substantial impacts are to be analyzed. (See *ibid.*) In other words, to assess the potential impacts of a proposed project on the physical environment, it is necessary to compare the project against what has already been set out as the planned impact. As stated in the CEQA Guidelines, the purpose of the requirement that an EIR disclose and discuss any inconsistencies "is to give the public and decision makers the most accurate and understandable picture practically possible of the project's likely near-term and long-term impacts." (CEQA Guidelines, § 15125, subd. (a).)

Consequently, the failure of an EIR to disclose a general plan inconsistency—and the failure to discuss the inconsistency that necessarily follows from the failure to disclose—renders the EIR insufficient. " '[W]hen the informational requirements of CEQA are not complied with, an agency has failed to proceed in "a manner required by law" and has therefore abused its discretion.' " (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 386 (*Napa Citizens*).)

In HomeFed's view, the City's Final REIR adequately "disclosed and analyzed potential inconsistencies with the General Plan and applicable development standards, while ultimately concluding that the Project was General Plan consistent." This argument is belied by the record. The 2022 Final REIR excised all discussion of the 2020 amendment to the General Plan from its discussion of the Project. The removal of this discussion is shown in strikethrough edits. Instead, the Final REIR simply asserts that "the proposed project would implement development generally consistent with the 16 Guiding Principles" set out in the General Plan. This is not enough to disclose the significant inconsistency between the density of housing in the approved 2022 Project and the density the City admitted was required by the General Plan's lot size restrictions.

Nor is HomeFed correct that the Final REIR sufficiently disclosed and discussed the inconsistency by including a "detailed, policy-by-policy evaluation in Table 4.10-1, spanning approximately 25 pages and analyzing consistency with each applicable General Plan policy." A review of the Final REIR's discussion of the consistency evaluation identifies no reference to the lot size limitations for the Fanita Ranch site in the General Plan. In fact, documents reflecting edits demonstrates other references to the lot size restrictions that had previously been in the environmental report were eliminated. The Final REIR also avoids discussing the density or intensity of the proposed housing, generally, in the section HomeFed cites. The Final REIR thus does not address the 2022 Project's lot size inconsistency with the General Plan's lot size limitations. This constitutes the failure to proceed in " ' "a manner required by law" ' " and is therefore an abuse of discretion. (*Napa Citizens, supra*, 91 Cal.App.4th at p. 386.)

42

E.      *Petitioners' SPZL, Subdivision Map Act, and CEQA Challenges Are Not Time-Barred*

HomeFed contends Petitioners' claims are time-barred under CEQA and section 65009 in an effort to escape the determination that the City violated the SPZL, Subdivision Map Act, *and* CEQA.  HomeFed claims the Petition is an attempt to "relitigate the [Essential Housing] Program's application," and thus asserts Petitioners are challenging either the City's adoption of Ordinance 592 or the City's "certifi[cation of] Fanita Ranch under the [Essential Housing] Program."  HomeFed then complains that because Petitioners have never filed a timely challenge to either the City's adoption of the ordinance or the City's certification of the Project, their claims must be untimely.  We reject this argument.

HomeFed misconstrues what Petitioners have challenged by their Petition.  Petitioners allege the City has violated the SPZL and the Subdivision Map Act by approving the 2022 Project, certifying the EIR for the Project, and adopting findings in support of the Project's approval and certification of the Final REIR on September 14, 2022, as well as by filing the Notice of Determination for the 2022 Project with the County Clerk on September 15, 2022.  The Petition does not assert a violation of state law arising from the City's adoption of Ordinance 592, nor does it challenge the Director's certification of the Project under the Essential Housing Program.

The record demonstrates Petitioners' claims under the SPZL, Subdivision Map Act, and CEQA were timely filed.  The Petition was filed on October 14, 2022, 30 days after the approval vote and 29 days after the City filed the Notice of Determination.  The filing of the Petition therefore met both the 90-day statute of limitations applicable to challenges to local planning and zoning decisions (see *Travis v. County of Santa Cruz* (2004) 33

43

Cal.4th 757, 767 [action challenging conditions of permit brought within 90 days of final administrative action was timely]; *Honig v. San Francisco Planning Dept.* (2005) 127 Cal.App.4th 520, 526 [section 65009, subd. (c) "establishes a short, 90–day statute of limitations, applicable to both the filing and service of challenges to a broad range of local zoning and planning decisions"]) and the even shorter 30-day statute of limitations for a CEQA challenge triggered by the filing of a facially valid notice of determination (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 48 [if a valid notice of determination has been filed, any CEQA challenge to that decision must be brought within 30 days].)

F.  *The City's "Approval" of the 2022 Project Did Not Constitute a Violation of Elections Code Section 9241*

Petitioners alleged the City violated section 9241 of the Elections Code by approving the 2022 Project within one year of it repealing the GPA after a citizen referendum required the City to place the GPA on the ballot. The trial court agreed. HomeFed raises multiple challenges to the court's conclusion that there was an Elections Code violation. We are persuaded by one of HomeFed's arguments and conclude the error is sufficient to warrant reversal of the judgment as to the Elections Code claim, only.

Under the California Constitution, "[t]he legislative power of this State is vested in the California Legislature . . . but the people reserve to themselves the powers of initiative and referendum." (Cal. Const., art. IV, § 1.)

The referendum power allows voters to weigh in on laws that have already been passed. Any voter or group of voters gathering enough signatures for a referendum can place a legislative enactment on the ballot for a vote. A referendum suspends operation of the law in question, unless

44

and until it is approved by a majority of voters. (*Wilde v. City of Dunsmuir* (2020) 9 Cal.5th 1105, 1111.)

Section 9241 of the Elections Code (section 9241) contains a provision prohibiting local jurisdictions from approving the same or similar legislation for a one-year period after a referendum has qualified for placement on the ballot and either the people have rejected the legislation by majority vote *or* the legislation subject to the referendum has been repealed by the local jurisdiction.

After the City approved the 2017 Project, certified its EIR, and approved the corresponding GPA the City considered necessary for approval of that project, a group of Santee community members gathered a sufficient number of signatures to refend the GPA. Once the referendum was filed with the City in late October 2020, the City faced a decision: (1) repeal the GPA or (2) place the referendum on the ballot for a vote. The City opted to place the referendum on the ballot for the election scheduled to take place in November 2022.

But as the referendum and ballot process moved forward, a court directed the City to set aside all 2017 Project approvals, including the GPA and the EIR certification. The City complied with the court order by setting aside all project approvals and repealing the GPA on May 25, 2022. Because the GPA had been repealed, in June 2022, the City removed the referendum from the ballot for the November 2022 election.

Just a few months later, on September 14, 2022, the City voted to approve the virtually identical 2022 Project and certify its EIR. But as should be clear, by this point, the City decided it no longer needed to amend the General Plan because the 2022 Project was "deemed" consistent with the General Plan due to its certification as an Essential Housing Project.

45

Petitioners assert the City's approval of the 2022 Project violated section 9241's one-year stay provision because the approval occurred less than one year after the City repealed all approvals related to the 2017 Project, which was virtually identical to the 2022 Project and was the subject of the qualifying referendum.

Among other things, HomeFed argues that section 9241 does not apply to the City's September 14, 2022 approval of the 2022 Project because that approval was "adjudicative" and not "legislative."

Section 9241 applies only to prohibit repeat *legislative* actions. " 'Courts have long observed that "[t]he power of referendum applies only to acts that are legislative in character." ' " (*Move Eden Housing v. City of Livermore* (2024) 100 Cal.App.5th 263, 275–276 (*Move Eden I*).) HomeFed asserts the City's approval of the 2022 Project is considered "quasi-adjudicative" in nature, not legislative, and it therefore cannot be the subject of section 9241.

We agree. Typical land-use project approvals—separate from a general plan adoption or amendment—are not legislative, but are instead adjudicatory or quasi-adjudicatory: "The well-settled functional distinction between [legislative and adjudicatory decisions] is set out in *Patterson v. Central Coast Regional Com.* (1976) 58 Cal.App.3d 833 [130 Cal.Rptr. 169]. ' "Generally speaking, a legislative action is the formulation of a rule to be applied to all future cases, while an adjudicatory act involves the actual application of such a rule to a specific set of existing facts." . . . "Wherever an act undertakes to determine a question of right or obligation, or of property, as the foundation upon which it proceeds, such act is to that extent a judicial one, and not the proper exercise of legislative functions." ' " (*Landi v. Monterey County* (1983) 139 Cal.App.3d 934, 936 [cleaned up]; see *Land*

46

*Waste Management v. Contra Costa County Bd. of Supervisors* (1990) 222 Cal.App.3rd 950 (*Land Waste*); *Citizens for Jobs & the Econ. v. County of Orange* (2002) 94 Cal.App.4th 1332.)  Thus, "[a]djudicatory acts include the granting of variances and conditional use permits, and the approval of tentative subdivision maps." (*Landi,* at p. 936.)  In contrast, local agencies perform a legislative function when they enact or amend general plans and zoning ordinances.  (*Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1152.)

Consequently, the City's "approval" of the 2022 Project itself, including the approval of all subdivision maps, conditional use permits, variances, etc., involved adjudicatory acts; in the absence of the adoption of a General Plan amendment, no legislative act was undertaken in connection with the 2022 Project.  In contrast,  the City undertook a legislative act during its 2017 Project's approval process by adopting the GPA.  And the citizen referendum challenged only this act—i.e., the passage of the ordinance through which the City adopted the GPA.  The referendum did not attempt or purport to place on the ballot a vote regarding the City's general approvals of the 2017 Project or its certification of the corresponding EIR.  The referendum properly sought *only* a vote on whether to approve the General Plan Amendment.

But because of the process by which the City approved the 2022 Project—i.e., its use of the Director's certification of the Project under the Essential Housing Program to "deem" the Project consistent with the General Plan—the City avoided adopting an amendment to the General Plan.  And because of this, the City's approval of the 2022 Project did not involve the sole "legislative" aspect of the 2017 Project's approval process that would have been subject to section 9241's one-year prohibition.

47

The difference in the manner by which the City approved the 2017 Project versus the 2022 Project leaves an open question, though. For purposes of section 9241's year stay provision, is it nevertheless possible for an ordinance or set of ordinances to be considered "essentially the same" as a prior ordinance or set of ordinances where the new ordinance does not involve the same legislative act, or a similar legislative act, as the ordinance originally challenged by referendum? According to a recent appellate decision in *Move Eden Housing v. City of Livermore* (2025) 114 Cal.App.5th 1282 (*Move Eden II*), the answer to that question is no.

"In interpreting the stay provision in section 9241, courts have interpreted the word 'ordinance' to include not only an *identical* enactment but also a subsequent enactment that is 'essentially the same' as the original enactment." (*Move Eden II, supra*, 114 Cal.App.5th at p. 1301.) And, in trying to understand whether a subsequent enactment is "essentially the same" as the prior enactment, one must consider what the original legislative act was: "[W]e construe 'ordinance' as used in the phrase 'the ordinance shall not again be enacted by the legislative body for a period of one year' (§ 9241) to refer to a subsequent enactment that is 'essentially the same' *with respect to a legislative act or acts that made the original enactment subject to the referendum power in the first place.* A subsequent enactment violates section 9241 if, during the stay period, it readopts *one or more legislative decisions* in an identical or insufficiently modified form (as in *Lindelli [v. Town of San Anselmo* (2003)] 111 Cal.App.4th 1099). But section 9241 does not prohibit a city from readopting administrative acts that do not have the effect of undermining the stay as to any legislative act in the original enactment." (*Move Eden II, supra*, 114 Cal.App.5th at pp. 1305–1306.) Stated more succinctly, "the relevant comparison is with the *legislative* act or acts in the

48

original enactment that made the enactment subject to the referendum power." (*Id*. at pp. 1301–1302, italics added.)

Petitioners rely on the holding in *Move Eden II* to claim they should prevail on the issue. They assert, "Here, the original legislative act subject to the referendum power was the City's 2020 approval in the first instance of the Fanita Ranch Project, including the [GPA] that was necessary to bring the proposed project into conformity with the General Plan." But this framing too broadly defines the "original legislative act" that was the subject of the referendum. The original legislative act was not "the City's 2020 approval . . . of the Fanita Ranch Project." The original legislative act—and the *only* act that was subject to the referendum—was the City's adoption of the GPA. Its adoption was the "legislative act . . . that made the original enactment subject to the referendum power in the first place" (*Move Eden II, supra*, 114 Cal.App.5th at p. 1301). A faithful application of *Move Eden II* requires us to *accurately* define the original legislative act in order to assess the subsequent act against which it is being compared. Petitioners have failed to do that here.

Therefore, in considering whether the City's subsequent enactment or enactments is/are "substantially the same" as the enactment subject to the referendum and is thereby subject to section 9241's one-year stay, we must ask whether it has "readopt[ed]" the "one . . . legislative decision[ ]"—i.e., the GPA—"in an identical or insufficiently modified form." (*Move Eden II, supra*, 114 Cal.App.5th at p. 1301.) It is clear the City did *not* readopt an amendment to the General Plan in identical or insufficiently modified form. In fact, it did not adopt *any* amendment of the General Plan, despite the 2022 Project's inconsistency with the General Plan. This omission by the City, in fact, leads to our prior conclusion the City violated state laws that require

49

actual consistency between the proposed project and a general plan, and/or disclosure and discussion of an inconsistency.  Because the City did not readopt an amendment to the General Plan in identical or substantially identical form, the City did not violate the one-year prohibition on repeat legislative actions set in section 9241.

We acknowledge the conclusion we reach in connection with the section 9241 claim may seem unusual in light of our determination that the City's conduct in approving the 2022 Project violated other state law requirements. It may also be somewhat ironic to conclude the City cannot be held liable for a violation of the Elections Code's one-year legislative prohibition as a direct result of the actions the City took with respect to development of the Fanita Ranch site.  But, if anything, this result highlights the tactic the City chose to pursue here, as it points out precisely how the City cut the public out of a crucial decision-making process that it was intended to participate in.

As the record reveals, before 2022, *all* parties agreed that the proposed development of the Fanita Ranch site in the 2017 Project (and in its virtually identical offspring, the 2022 Project) required an amendment to the General Plan.  In fact, everyone agreed the 2017 Project was inconsistent with the General Plan because it did not meet the General Plan's lot size requirements.  But by creating a new program to certify the 2022 Project as an Essential Housing Project and then using the fact of its certification to "deem" the virtually identical 2022 Project consistent with the General Plan, the City avoided having to amend the General Plan to ensure the Project would reflect actual consistency with it.  And by avoiding the need to amend the General Plan, the City has effectively taken away the voters' power to challenge (by referendum) or change (by initiative) the policies set out in the General Plan with respect to the Fanita Ranch site.  It has also bypassed the

will of the voters as expressed in Measure N, the proposition Santee voters adopted that requires voter approval for any development that would increase residential density or intensity over what the General Plan allows. All of this demonstrates how the City's use of the Essential Housing Program to "deem" the 2022 Project consistent with the General Plan without considering whether true consistency exists has undermined the state's system of land use regulation, and allowed the City to bypass the normal processes—required by state law—that exist to empower voters in legislative decision-making by the City with respect to land use decisions.

Thus, although we ultimately conclude the City's actions did not violate Elections Code section 9241, this result stems directly from the City's failure to ensure actual consistency of the Project through a legislative action it had previously considered necessary for consistency—the adoption of an amendment to the General Plan. The absence of an amendment to the General Plan to ensure facial consistency with a standard that is mandatory and clear leaves the 2022 Project *inconsistent*, which constitutes a violation of the SPZL and the Subdivision Map Act. Further, as we have explained, the lack of *disclosure* of the inconsistency renders the City's certification of the Final REIR unlawful, as well. Consequently, although Petitioners cannot prevail on their Elections Code claim, there is no question they remain entitled to the relief granted by the trial court in connection with their claims of violations of the SPZL, Subdivision Map Act, and CEQA.

## DISPOSITION

The judgment of the trial court is reversed only with respect to declaratory relief determination in paragraph 3 that the City violated "the Elections Code." To the extent this determination may affect collateral matters such as the recovery of costs and/or attorney fees, the trial court may

undertake any additional proceedings it deems necessary.  In all other respects the judgment is affirmed.  Petitioners, who are respondents in this appeal, are awarded costs on appeal.


                                                                DO, Acting P. J.

WE CONCUR:


KELETY, J.


RUBIN, J.